Michael D. CAREY, et al.,
Plaintiffs, Appellant,

v.

MT. DESERT ISLAND HOSPITAL,
et al., Defendants, Appellees.

Michael D. CAREY, et al., Plaintiffs,
Cross–Appellees,

v.

MT. DESERT ISLAND HOSPITAL, et al., Defendants, Cross–Appellants.

Nos. 97–1661, 97–1688.

United States Court of Appeals,
First Circuit.

Heard Nov. 7, 1997.

Decided Aug. 18, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied Oct. 23, 1998.

Jonathan B. Sprague, with whom A. James Johnston, Sidney R. Steinberg, and Post & Schell, P.C. were on brief, for appellant.

Peter B. Bickerman, with whom Sumner H. Lipman, Ronald E. Colby, III, and Lipman & Katz, P.A. were on brief, for appellee.

Before STAHL, Circuit Judge, ALDRICH and COFFIN, Senior Circuit Judges.

COFFIN, Senior Circuit Judge.

Michael D. Carey brought this suit against Mt. Desert Island Hospital ("MDI") for gender discrimination in violation of Title VII of

**34**

the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17, and the Maine Human Rights Act, 5 M.R.S.A. §§ 4551–4632. He alleged that he was discharged from his position as Vice–President of Finance because he was male.

After a seven day trial, a jury returned a verdict in Carey's favor, awarding compensatory and punitive damages of $210,000 and $400,000, respectively. The district court reduced the $610,000 total to $200,000 to conform with the statutory cap for awards of compensatory and punitive damages under Title VII. See 42 U.S.C. § 1981a(b)(3)(C). The court declined to award front pay, reasoning that it was included under the statutory cap, and was inappropriate under the circumstances of the case. The court awarded back pay in the amount of $110,070, making the total amount of recovery $310,070.

The parties cross-appealed, MDI attacking the verdict and Carey challenging the post-verdict rulings limiting his recovery. MDI appeals on five points: (1) sufficiency of the evidence; (2) jury instructions on the role of gender discrimination in the decision to terminate; (3) peremptory challenges to four female prospective jurors; (4) admission of certain deposition evidence; and (5) admission of a remark by an MDI employee manifesting anti-male animus. Carey argues that the court erred in failing to award front pay and in limiting the back pay award.

Our review of the record reveals that this was a case with much to say on either side, involving the always difficult question of probing the wellsprings of human motivation. Moreover, it was in our minds an exceptionally hard fought trial. While the verdict could have gone either way, our review persuades us that no error was committed below such as to justify reversal. We therefore affirm the judgments.

### I. Sufficiency of the evidence

Title VII makes it unlawful, inter alia, to discharge any individual because of his sex. See 42 U.S.C. § 2000e–2(a)(1). Where the plaintiff must prove his case by circumstantial evidence in the absence of direct evidence, as here, "the plaintiff must make out a prima facie case of discrimina-

tion, the employer must then come forward with some non-discriminatory justification, and the plaintiff finally is given the opportunity to convince the trier of fact that the justification was pretextual and that the real reason was discriminatory." Molloy v. Blanchard, 115 F.3d 86, 91 (1st Cir.1997) (quoting Cuello–Suarez v. Puerto Rico Elec. Power Auth., 988 F.2d 275, 278 (1st Cir. 1993)); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (setting forth the burden shifting framework); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). At all times, the plaintiff retains the burden of persuasion.

There is no real dispute that Carey has established a prima facie case, as he has shown that he had a satisfactory job performance record but was terminated and replaced by a woman. See Byrd v. Ronayne, 61 F.3d 1026, 1031 (1st Cir.1995) (listing requirements for the prima facie case) (citation omitted). And MDI has presented a legitimate nondiscriminatory reason for termination, namely, Carey's continued mismanagement of his financial responsibilities.

Our focus in determining whether or not there was sufficient evidence to justify the verdict therefore rests on the third stage of the Title VII analysis—whether Carey introduced sufficient evidence to show that MDI's justification was false and that the real reason for his discharge was gender. Carey may rely on the same evidence to prove pretext and discrimination. See Udo v. Tomes, 54 F.3d 9, 13 (1st Cir.1995). In considering a claim of insufficient evidence, we take the record in the light most favorable to the verdict. See Troy v. Bay State Computer Group, Inc., 141 F.3d 378, 382 (1st Cir.1998).

### A. Events leading to termination.

MDI is a thirty-nine bed community hospital in Bar Harbor, Maine, with approximately 200 employees. In 1983, James Mroch, the Hospital's CEO, hired Carey as Comptroller. In 1991, Carey was promoted to Vice President of Finance. His responsibilities included preparation of budgets and financial re-

ports, working with outside auditors, service on various committees, including the Management Committee, and supervision of the Hospital's accounting and business offices.

The critical period in this case begins in January 1993 and extends to June 1994. In January 1993, MDI's Board of Trustees discharged Mroch, and Dan Hobbs carried out the duties of CEO until September of that year. In the meantime, Lynda Tyson, who had become a Board member in 1989 and chairperson in 1993, engaged a professional recruiter, Anna Phillips, to find a permanent replacement for Mroch. Carey applied for the position but in June was told he would not be considered further. In July 1993, after its first choice, David Pagniucci, declined the offer, the Board offered the job to Leslie Hawkins. She accepted and commenced employment in mid-September 1993.

In the interim, on April 30, 1993, MDI's new outside auditors, Berry, Dunn, McNeil & Parker ("Berry, Dunn") prepared a "1993 Management Letter" reporting conditions observed during its end of the fiscal year audit of MDI. The letter contained, without specific identification, both "reportable conditions" and "other observations." "Reportable conditions were defined as 'matters . . . relating to significant deficiencies in the design or operation of the internal control structure that, in our judgment, could adversely affect the Organization's ability to record, process, summarize, and report financial data consistent with the assertions of management in the consolidated statements'."

Shortly after Hawkins commenced her duties, in September 1993, Tyson arranged a meeting with Hawkins, the Board, and the Berry, Dunn auditors to discuss the Management Letter. Carey was not invited. The auditors said that while the items in the letter were serious and needed to be addressed, the finance department, with some assistance, should be able to rectify them before the next audit.

In April 1994, Hawkins asked Carey to present a proposed fiscal 1995 budget to the Board before April 30. Realizing one week before the deadline that he could not complete the assignment in time, Carey asked

for and was granted a one month extension. In May, he submitted a budget, which projected large deficits and some high expenses. Hawkins and MDI's finance committee found the proposal unacceptable and sent the budget back for reworking.

In June, Hawkins met with the Berry, Dunn auditors, who told her that the bulk of the deficiencies noted in the 1993 Management Letter were still present. On June 23, Hawkins terminated Carey, followed soon by his female assistant, Robinson. She gave as reasons the uncorrected problems noted in the 1993 Management Letter, lack of a budget, and lack of confidence in Carey and Robinson. Hawkins advised Lynda Tyson, the Executive Committee, and the full Board; all supported her action.

### B. *Pretext.*

■ The series of events and concerns described above indicates a very legitimate, non-discriminatory justification for discharging Carey. More than speculation or random evidence of satisfactory performance is required to constitute a sufficient basis for a jury finding that incompetency and mismanagement were not the real reason for the discharge. *Cf. Byrd,* 61 F.3d at 1030 (addressing the summary judgment context). We therefore distill all the evidence that points to pretext.

We begin by examining Carey's work record. In evaluating Carey in 1992, Mroch said:

Mike works very hard, adapts quickly to change, and keeps going even when doing so is difficult. Mike has responded very well to difficult situations brought about by various board members. Mike's fiscal abilities are excellent.

More recent and therefore more germane is Hobbs' recommendation to the CEO Search Committee in June 1993 that Carey be considered for the position of CEO:

I have worked closely with Mike since early February during this difficult budgeting process and Mike has shown great tact and diplomacy in negotiating with department heads in an attempt to reduce the budget expenses, particularly in pay-

roll. I have been very impressed with the manner in which it was done and which made the decision more acceptable by those directly involved.

Then there is the key 1993 Management Letter itself. What sounds like a massive indictment could have been read by a skeptical jury as a list of technical accounting recommendations to be expected from a firm making its first impression on a client. Certainly, it appears difficult for a reader to distinguish what the accountants deemed a fairly serious "reportable condition" from one of the "other observations." The suggestions included recording cash on hand to the general ledger, locking up the blank checks, avoiding imposing too many payroll functions on a single individual (i.e., using more personnel), retaining outpatient records, insuring loss of records, and use of disaggregated balance sheets to show that individual restricted funds are in monthly balance.

A jury could reasonably conclude that nothing in this suggested an alarming hazard or a smoking gun, such as that portrayed by Hawkins. Indeed, at least five of the recommendations ended with the observation that the finance staff was already attacking the problem. Berry, Dunn highlighted that many balance sheet accounts were not regularly reconciled or analyzed, requiring that numerous audit adjustments be made. They also explained in conclusion: "This letter appears critical by its nature because it is intended to present suggestions for management's consideration. It does not comment on the positive aspects we noted in the Hospital's system of internal accounting control and procedures during our engagement."

Even more revealing may have been the auditors' June 21, 1994 status letter prepared at Hawkins' request two days before Carey's discharge. This letter identified the areas listed in the 1993 letter that remained problematic. In contrast to normal practice, it was developed without input from Carey and his staff. Berry, Dunn auditors concluded that the bulk of deficiencies were still present in 1994. But upon a close reading of the 1993 and 1994 letters the jury might have understood the letters quite differently.

The 1993 letter occupied six pages and contained thirteen areas of criticism, whereas the 1994 letter had three pages, with five surviving areas of criticism. The remaining eight areas of reported deficiencies had been resolved, substantially improved, or, in one area, could not be addressed due to equipment malfunction. The principal remaining problem was inability to reconcile balance sheet accounts to supporting documentation. This, of course, might have been a critical shortcoming, but the jury need not have so concluded. Such a status letter, even in the absence of staff opportunity to defend and explain, might well have appeared to the jury as less than a clarion call for termination.

The jury also heard the testimony of Carey's expert witness, Israel Laeger, senior member of a Bangor, Maine, accounting firm. Laeger had reviewed all CPA audits and management letters from 1990 to 1995. He pointed out that (1) a new accounting firm may seek to impress a client with a sizeable list of criticisms; (2) "reportable conditions" are basically judgment calls that are the product of the accountant's subjective view of seriousness; (3) an "opinion audit" is one where the auditor can vouch for the accuracy of a financial statement; (4) a "qualified opinion" means that there are some "things not up to snuff" preventing an unqualified opinion; (5) all the audit opinions of MDI were unqualified, meaning that "they were given a clean bill of health"; and (6) the number of deficiencies identified in audit reports had steadily decreased from 1992 to 1994. Laeger concluded that nothing in the audit reports and letters indicated that Carey was not living up to his responsibilities as Chief Financial Officer.

Finally, the jury might have doubted the facial justifications advanced by Hawkins concerning the relative infrequency of meetings between Hawkins and Carey, whose offices were in close proximity. And they may have suspected that she thwarted his ability to succeed based on evidence that she refused to allow Carey to fill all the budgeted positions allotted him, did not give him any advance warnings of serious trouble despite earlier assurance that she would inform him if she had problems with his job perfor-

mance, and the absence of any effort to institute "progressive discipline" or corrective action, as was general practice, before dismissal.

We therefore cannot say that disbelief of the reasons proffered by MDI would be unsupported or unfounded.

### C. *Evidence of gender discrimination.*

This conclusion, however, would not be enough to support the verdict. It may very well be that Hawkins, Tyson, and the entire Board had come to the point where they did not like Carey's style, finding him too openly critical of others and insensitive in his public utterances. If such were the real motivation for his discharge, it might or might not be fair but certainly would not be discrimination prohibited by law. It therefore was incumbent on Carey to introduce sufficient evidence to enable a reasonable jury to find that the justifications advanced by MDI for his discharge were a cover for an underlying anti-male animus.

 In a case such as this, where a plaintiff must rely on circumstantial as opposed to direct evidence of gender discrimination, the evidence will necessarily be composed of bits and pieces, which may or may not point to an atmosphere of gender discrimination. While an employer should not find itself in jeopardy by reason of occasional stray remarks by ordinary employees,

> circumstantial evidence of a discriminatory atmosphere at a plaintiff's place of employment is relevant to the question of motive in considering a discrimination claim.... [E]vidence of a corporate state-of-mind or a discriminatory atmosphere is not rendered irrelevant by its failure to coincide precisely with the particular actors or timeframe involved in the specific events that generated a claim of discriminatory treatment.

*Conway v. Electro Switch Corp.*, 825 F.2d 593, 597–98 (1st Cir.1987) (citations omitted).

The record reveals the following evidence in support of Brennan's claim of sex based discriminatory animus:

—In August 1992, Fundraising and Public Relations Director (and member of the Management Committee) Carol Gordon had a discussion with Carey and another employee about a television program on child abuse at day care centers. She concluded the discussion with, "we live in a patriarchal society, and men shirk their duties toward child raising. And because men have money, power and position, because they have penises, then this is the type of thing that happens as a result." Carey told Evans that the remarks were inappropriate and filed a sexual harassment complaint with the Personnel Director, Penny Evans. Shortly thereafter, Evans expressed regret to Carey that he had taken her remark the wrong way and that he had filed a complaint.

—In late 1992, the steering committee for MDI's new Women's Health Center, whose members included Jeanne DuLong, Director of Nursing, Evans, Gordon, and Carey (the only male), prepared a mission statement for the Center. As first drafted, the statement barred the employment of men, including male physicians. Carey objected to the draft, indicated it could be illegal and sought a legal opinion. After obtaining the opinion, the mission statement was changed so as not to exclude men.

—In the spring of 1993, a management committee member, Brian McCarthy, complained to Evans about another employee's having thrown water in his face. He testified that Evans was not receptive to his complaint, telling him not to worry about it. When he asked what she would do in the event water was thrown at a female employee, Evans said the person would probably be fired. She explained, "we have different standards for men and women."

—Tyson, then Vice–Chair of the Board, helped secure the discharge of Mroch as President and CEO. Upon his termination in early 1993, she hired an executive search firm, placing Anna Phillips in charge of identifying a prospective CEO for MDI. In the summer of 1993, Gordon, Brian McCarthy, David Frongillo, Director of the MDI Pharmacy, and Hawkins, who was then a candidate, met with Phillips. Frongillo asked if there was a selection criterion involving gender, to which Gordon responded, "it's about

time that we get a woman for this position," and Phillips said that "they would very much like to put a woman in that position." Meanwhile, Carey's own application received short shrift. He testified that Phillips interviewed him for only about thirty minutes, never asked about his qualifications, and appeared not to have read his resume. Tyson testified that Evans, DuLong, and Gordon had all told her that they would not be "comfortable with Mr. Carey as CEO."

—By the time Hawkins was hired, Tyson and Gordon were close friends, as were Evans and Gordon, and all were uncomfortable with Carey. When Hawkins was hired, Tyson told her that she faced several challenges, "one of which was the financial stability and ... that she might have some problems in the finance department."

—In late 1993, MDI conducted an employee opinion survey, a summary of which was placed in an administrative mailbox used by both Carey and Hawkins. Although obviously intended for Hawkins, Carey saw the responses and noted on the summary page a statement from an unnamed employee that Hawkins needed to take action against "the power-hungry men in administration." Although the comment itself is entitled to little weight, that this message was intended for administration eyes and that the compiler of the survey results saw fit to place the comment on the summary page for Hawkins are more significant.

■ —Finally, Carey, when facing performance problems, appears to have been treated differently by Hawkins than were Evans, Gordon, and DuLong. Although only Carey and DuLong were Vice–Presidents, the other two were senior managers and all served on the Management Committee. "The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.... Exact correlation is neither likely nor necessary, but the cases must be fair congeners." *Molloy*, 115 F.3d at 91 (quoting *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir.1989)). All three women had encountered problems in their jobs and were given "progressive discipline,"

i.e., assistance and time to take corrective action, rather than prompt termination.

MDI in its briefs and argument compartmentalizes the above evidence, isolating each incident, relationship, or statement, arguing that each has no bearing on any animus that could have influenced Hawkins. But all of the evidence was presented to the jury and we would find it very difficult indeed to say that the totality fell below a triable threshold. The statements and incidents did not relate to miscellaneous low level employees but to a fairly tight group of top officials. We therefore hold that there was sufficient evidence to support a finding that deficiencies in Carey's handling of financial controls were not the real reason for his discharge but instead covered an action stemming from gender discrimination.

We see no point in separately analyzing the court's refusal to order a new trial. As is evident from our discussion on the sufficiency of the evidence, we do not consider the court's action to be an abuse of discretion. *See Simon v. Navon*, 71 F.3d 9, 13 (1st Cir.1995).

## II. *Jury Instructions*

■ MDI argues that the court in its original jury instructions committed error by charging that the plaintiff had the burden of showing by a preponderance of the evidence that "gender was a motivating factor" in MDI's decision to fire him. It had urged the court to use the words "a determining factor" or "the motivating factor," reasoning that, in cases resting on circumstantial rather than direct evidence, such language should be used to accord with our opinions in *LeBlanc v. Great American Ins. Co.*, 6 F.3d 836, 842, 846 (1st Cir.1993), and *Mesnick v. General Elec. Co.*, 950 F.2d 816, 828 (1st Cir.1991).

The court resisted, observing that in *LeBlanc* and other First Circuit cases we have used both "motivating" and "determining" without any clear indication that one was preferable. The court was persuaded that "a motivating factor" was the correct instruction by the wording chosen by Congress in Section 107(a) of the Civil Rights Act of 1991, an amendment to the Civil Rights Act of 1964. Section 107(a), codified as 42 § 2000e–2(m),

states, "an unlawful employment practice is established when the complaining party demonstrates that ... sex ... was a motivating factor for any employment practice, even though other factors also motivated the practice."

MDI argues that the court misapplied 42 § 2000e–2(m), which it maintains covers direct but not circumstantial evidence cases, and therefore committed reversible error. What MDI has not adverted to in its brief was that after the jury had been out for about ninety minutes, the jury sent the court a note asking for a legal definition of "motivating factor" with specific reference to "how much weight is to be rendered to make decision." What followed was, in our opinion, of crucial importance insofar as decision in this case is concerned.

Court and counsel proceeded to engage in a substantial colloquy, spanning eighteen pages of transcript. After hearing argument from counsel, the court dictated a draft supplemental instruction, which read in relevant part:

> The plaintiff therefore has the burden of establishing that it is more likely than not that gender was a motivating or determining factor in the firing of the plaintiff by the defendant. In other words, it is for the jury to determine, based on all the evidence, that it is more likely than not that the defendant's decision to terminate the plaintiff was motivated by gender discrimination. If you find that the plaintiff was discharged for reasons other than his gender you must find for the defendant.

At this juncture, Carey's counsel proposed adding, at the end of the first sentence, "even though other factors also motivated the practice." The court expressed concern that the proposed addition "conveys an impression that they need not concern themselves with what really caused the termination. As long as there's a drop of causal effect by any of these factors in the mix, they can find for the plaintiff."

Carey's counsel then tried to persuade the judge to drop the last sentence. Before doing so, the court called upon MDI's counsel to weigh in on the proposed language. MDI's counsel responded as follows:

MR.. JOHNSTON: Well, I think that last sentence is a perfectly accurate statement of the law, and I don't think it's misleading at all.

MS. FARRELL (co-counsel): It does balance out the rest of it.

After the court refused a request by Carey's counsel to add that gender discrimination need not be the sole motivating factor, the court accepted the draft supplemental instruction, unchanged.

We are aware of the controversy that exists over whether the "a motivating factor" language in 42 U.S.C. § 2000e–2(m) applies to all discrimination cases, as the language indicates, or was intended only to overrule in part the standard set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). If the latter is true, as MDI maintains, then the amendment is limited to "direct evidence/mixed motive" cases and leaves unscathed the *McDonnell Douglas* approach to "circumstantial evidence/pretext" cases. We see no need to enter this thicket at the moment. For the purposes of this case we assume that the court's original instruction was in error.

But we look upon the court's colloquy with counsel, the supplemental instruction, and the input from counsel as a thorough and effective effort to clarify an earlier misunderstanding. The first sentence of the supplemental instruction, it is true, does not specify what factor is determinative. But the second sentence, beginning with "in other words," narrows the meaning, clarifying that the decision must have been motivated by gender. If any doubt were to remain, the last sentence clearly conveys the thought that the defendant escapes liability unless the plaintiff establishes that the sole motivation was gender. Indeed, if anything, this wording favors defendant more than it should, for it goes beyond the concept of "determining," requiring that if *any* reason other than gender played, however minimal, a part in the discharge, Carey may not recover.

To cap all this, both counsel for MDI affirmatively indicated their approval of the sup-

plemental instruction to the court.[1] In our opinion, to hold under these circumstances that the trial court committed reversible error would impose an unrealistic burden of perfection on a court facing the constant pressures of trial.

### III. Miscellaneous Issues

As a very small tail on a very long dog, several other issues raised by MDI may be touched upon briefly. The first is that Carey's counsel, by peremptorily challenging four female potential jurors, and indicating that he was, in so doing, relying on a juror rating system which consisted of such factors as occupation, education, and familiarity with the local region, violated the teaching of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Inasmuch as MDI challenged three males and one female, the jury as drawn contained five men and five women, and, after Carey offered his rating system explanation, MDI indicated to the court that it had no more questions on the *Batson* issue, we find it difficult to find that the court abused its discretion in not pursuing explanations any further.

MDI also claims error in the admission into evidence of deposition testimony of Anna Phillips, which allegedly included hearsay and irrelevant material. MDI makes cursory reference in its brief to "feminist" beliefs of members of the search committee, arguing that these were not relevant to the present case. We confess ourselves unable, upon a thorough search of the record, to identify such material in Phillips' testimony. In any event, we cannot believe that in this lengthy trial discussion by Phillips of "feminist" beliefs held by persons at MDI could have made any impact. No case of reversible error has been made to us.

We find the same as to certain notes of Phillips that were not admitted into evidence but allowed to be shown in an overhead projector. MDI tells us they were "inherently unreliable, prejudicial and irrelevant." But we are not told just what they were and how they would have adversely

impacted MDI. We expect more from counsel serious about asserting reversible error.

Finally, MDI claims error in admitting over objection Gordon's "penis and power" comment, with which we commenced our search for gender discriminatory indicia. The specific claim is that the prejudicial effect of the comment greatly outweighed its probative value. Were this an isolated remark or incident, this would be a more viable argument. But in context, particularly in light of the evidence of Gordon's close friendship with Tyson and her senior position in management, we simply cannot say that the court abused its discretion in admitting the evidence. To ask for a new trial on the basis of this ruling strains our credulity.

### IV. Front and Back Pay

Carey appeals the denial of front pay and the partial reduction of his back pay award for failure to mitigate damages. We review the district court's decision to deny these awards for an abuse of discretion. *See Selgas v. American Airlines, Inc.*, 104 F.3d 9, 12–13 (1st Cir.1997) ("[t]rial courts have discretion to fashion awards in Title VII cases so as to fully compensate a plaintiff in a manner that suits the specific facts of the case").

Carey alleges error in the court's conclusion that front pay was included under the statutory cap, *see* 42 U.S.C. § 1981a(b)(3)(C), and that such an award was unnecessary given other relief granted Carey. We elect not to address the statutory cap issue as we find the district court's determination that Carey received sufficient compensation without front pay to be entirely within the court's discretion.

The court addressed the merits of Carey's front pay request on two occasions. On November 20, 1996, after receiving briefing from both parties on the front pay issue, the court ruled that front pay is included under the statutory cap and

---

1. We differ from our dissenting brother in our reading of the asserted reservation of the objection, which we view as applying at most to the

first sentence of the supplemental instruction but not to defense counsel's unqualified endorsement of the last sentence as a correct statement of law.

in any event, the Court would be reluctant to award additional front pay in this case because of the substantial liquidated damages awarded by the jury ... [A]ny additional award of front pay would be inappropriate under the circumstances of this case. *Wildman v. Lerner Stores Corp.,* 771 F.2d 605, 616 (1st Cir.1985) [finding that future damages were unnecessary, given that the plaintiff had been awarded compensatory damages, liquidated damages, and double and additional damages under state law].

And on February 20, 1997, the court denied Carey's motion to reconsider, stating,

[w]hether front pay is included under the statutory cap or not, the Court indicated that it would not award Plaintiff front pay in this case. The $200,000 in damages Plaintiff will recover after the jury's award of $610,000 is capped, plus the back pay the Court will award Plaintiff, the exact amount of which is still uncertain, will more than adequately compensate plaintiff.

We discern from these statements that the court appears to have looked to the jury's award of punitive damages rather than to the statutorily capped damage award in denying front pay on November 20, 1996. While this was inappropriate as the liquidated damages award was not an accurate measure of the award Carey would actually receive, it is clear that on February 20, 1997, the court found the $200,000 cap and back pay award fully sufficient to compensate Carey. This determination, standing alone, is entirely supportable, and we can see no basis to conclude, as Carey would have us do, that it was "tainted" by the November 20, 1996 ruling. We can find no "strong evidence of a lapse in judgment," *Selgas,* 104 F.3d at 12, as required for a finding of an abuse of discretion.

■■■ Neither can we discern an abuse of discretion as to the back pay award. Carey was entitled to recover for what he would have earned absent the discharge, reduced by any compensation that he actually received and any additional amount that he would have received through reasonable efforts to mitigate the damages, with the employer bearing the burden of proof on the

issue of mitigation. *See Troy,* 141 F.3d at 382; *Wilcox v. Stratton Lumber, Inc.,* 921 F.Supp. 837, 842 (D.Me.1996); 42 U.S.C. § 2000e5(g)(1).

■■■ Correctly applying this standard, the court concluded that MDI had successfully shown through expert testimony and evidence concerning the actual number of applications made relative to the number of positions available that Carey did not exercise reasonable diligence in seeking comparable employment. The result was an award to Carey of $110,070 in back pay, which represented a reduction by $100,000 for failure to fully mitigate damages and a reduction by the amount of money Carey earned or received in unemployment during the relevant period.

In support of his abuse of discretion argument, Carey essentially repeats the evidence he presented below, relying particularly on testimony from his expert to rebut evidence by MDI's expert. We see no need to pursue this further. The court's order demonstrates a thoughtful weighing of the credibility of the witnesses and the various evidence presented by each party, resulting in an award that was somewhere in between that desired by each party. Such weighing was fully within the court's discretion and is supported by the evidence.

## V. *Conclusion*

We therefore affirm the district court on all issues raised by both parties on appeal. Each party shall pay its own costs.

BAILEY ALDRICH, Senior Circuit Judge, concurring:

The difficulty of the issue that principally divides the court is indicated by the fact that discussion of the jury's question that led to a three sentence supplemental instruction, occupies 18 pages of transcript. My disagreement with our dissenting brother is based on my assessment of the jury's thinking as shown by its question, and my belief that if a jury hears twice from the same source it is likely to emphasize, if not concentrate on, what it has last heard.

The jury's question is interesting. We do not have the exact language, but it appears to have requested a legal definition of "motivating factor," and "how much weight is to be rendered to make a decision?" Since it had been instructed as to what is generally needed to meet the burden of proof I assume great thought went into this question: Is it enough for gender to be a concurrent factor, or does motivating require sufficient weight to itself effect the decision? This last is what it was told. What the dissent labels as part (b) of the court's response to the question, "not necessarily inconsistent with the established standards governing pretext cases," (a bit overgrudging, I prefer "consistent" to not "necessarily inconsistent") the dissent would diminish because presumably "colored by the original 'a motivating factor' instruction." But was it not just because the jury was not satisfied by the original instruction that it asked for illumination? With great respect, is it not unfair to say that the questioned shadow persisted? I say particularly unfair when defendant's last remark was an assent. The jury had received an apparently full answer to its question, and I do not believe it is to be thought to have reached back and modified it by what had bothered it before. I read (b) and (c) together as understood to mean that plaintiff must show that discrimination was of sufficient weight to itself warrant the discharge, and it was in fact the activating cause. To this defendant can have no complaint. Where its answer embraced the exact subject matter of the jury's inquiry the court was entitled to believe it was complete. Fairness required defendant to speak up if it disagreed. *Wilson v. Maritime Overseas Corp.*, 150 F.3d 1, 7 (1st Cir.1998).

**2.** Direct evidence is often said to be the "evidentiary equivalent of a 'smoking gun.'" *Id.; Ayala–Gerena v. Bristol Myers–Squibb Co.*, 95 F.3d 86, 95–96 (1st Cir.1996); *see, e.g., Wilson v. Susquehanna Township Police Dep't*, 55 F.3d 126, 128 (3d Cir.1995) (uncontroverted comments by town official who said he was "of one mind" with actual decisionmaker in stating that he "wouldn't hire any woman" to fill supervisory position sought by plaintiff); *Haynes v. W.C. Caye & Co.*, 52 F.3d 928, 930–31 (11th Cir.1995) (unrebutted evidence that decisionmaker believed that "a woman was not competent enough" to do the particular job sought by female plaintiff). Indirect evidence includes any other evidence which, if preponderant, could provide a circum-

STAHL, Circuit Judge, dissenting:

The majority "assume[s]," for purposes of analysis, that the district court's original charge was in error, but concludes that its response to the jury's question about the meaning of the erroneous "motivating factor" instruction was fully curative, and/or that MDI's counsel waived its objection by acceding to a portion of the court's supplemental instruction. Because I cannot agree that the defendant hospital either waived its objection to or was not prejudiced by the erroneous instruction, and because I believe it important to explain *why* the original instruction was erroneous, I respectfully dissent.

## I.

Employment discrimination cases involving claims of disparate treatment can be divided into two broad categories: (1) cases in which the plaintiff has "direct" evidence of discrimination, and (2) cases in which the plaintiff's evidence of discrimination is "indirect." *See, e.g., Smith v. F.W. Morse & Co.*, 76 F.3d 413, 421 (1st Cir.1996).[2] Under prevailing law, the proper characterization of a plaintiff's case as direct or indirect largely determines the manner in which the plaintiff may establish the defendant's liability.

Where the plaintiff's proof is indirect (as will typically be the case), the plaintiff's claim normally will be adjudicated in accordance with the familiar rules laid out in the line of cases beginning with *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *see F.W. Morse*, 76 F.3d at 421, and recited in the panel majori-

stantial or inferential basis for finding discriminatory animus. *See, e.g., Fuller v. Phipps*, 67 F.3d 1137, 1143 (4th Cir.1995) (evidence of differential treatment); *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 641 (3d Cir.1993) (evidence of discriminatory atmosphere); *Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir.1992) (statistical evidence). In some circuits, certain strong forms of circumstantial evidence are treated as functionally equivalent to direct evidence. *See, e.g., Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 513 (3d Cir.1997); *Fields v. New York State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 122 (2d Cir.1997).

ty's opinion, *see ante.*[3] At the time of the enactment of the Civil Rights Act of 1991 ("1991 Act"),[4] cases in which a plaintiff had *direct* evidence of discrimination were governed not by *McDonnell Douglas,* but by *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). *See, e.g., Jackson v. Harvard Univ.,* 900 F.2d 464, 467 (1st Cir.1990). Under the *Price Waterhouse* rule, if a plaintiff introduced direct evidence of discrimination sufficient to demonstrate (by a preponderance of the evidence) that an impermissible consideration (race, gender, etc.) was a motivating factor in the contested job action, the burden of proof then shifted to the defendant to prove that it would have taken the same job action against the plaintiff even absent the impermissible motivating factor. *See Jackson,* 900 F.2d at 467. If the defendant succeeded in so proving, it avoided liability altogether. *See Price Waterhouse,* 490 U.S. at 244–45, 109 S.Ct. 1775 (plurality opinion); *id.* at 261–62, 271, 109 S.Ct. 1775 (O'Connor, J., concurring).[5]

Against the backdrop of *McDonnell Douglas* and *Price Waterhouse,* Congress in 1991 amended Title VII of the Civil Rights Act of 1964 by adding two new subsections. Section 107(a) of the 1991 Act provided the following:

> Except as otherwise provided in this title, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was *a motivating factor* for any employment practice, even though other factors also motivated the practice.

1991 Act, Pub.L. No. 102–166, § 107(a), 105 Stat. 1071, 1075 (1991) (emphasis added) (codified at 42 U.S.C. § 2000e–2(m)). Section 107(b) further added:

> On a claim in which an individual proves a violation under [§ 107(a) ] and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court—

> (i) may grant declaratory relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under [§ 107(a) ]; and

> (ii) shall not award damages or issue an order requiring admission, reinstatement, hiring, promotion, or payment, described in subparagraph [42 U.S.C. § 2000e–5(g)(2)(A) ].

*Id.,* § 107(b), 105 Stat. at 1077 (codified at 42 U.S.C. § 2000e5(g)(2)(B)(i)-(ii)).

The 1991 Act was, in large part, Congress's response to a series of Supreme Court decisions interpreting various provisions of the federal civil rights laws. *See Landgraf v. USI Film Products,* 511 U.S. 244, 250, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Section 107 was specifically intended to address—and overturn, in part—the holding of *Price Waterhouse. See id.; Tanca v. Nordberg,* 98 F.3d 680, 681–82 (1st Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1253, 137 L.Ed.2d 333 (1997); *see also* H.R.Rep. No. 102–40(I) (Education and Labor Committee), at 45–47 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 583–86; H.R.Rep. No. 102–40(II) (Judiciary Committee), at 16–19 (1991), *reprinted in* 1991 U.S.C.C.A.N. 694, 709–12.

Under Section 107, if a plaintiff proves that at least one of the motivating factors for the defendant's employment action was an impermissible one—*i.e.,* that the defendant acted, at best, with "mixed motives"—liability under Title VII is established. 42 U.S.C. § 2000e–2(m). Section 107 thus abrogates the holding of *Price Waterhouse,* insofar as that decision permitted an employer with "mixed motives" to avoid liability altogether by proving that it would have taken the same job action against the plaintiff absent any impermissible motivation. Under Section

---

**3.** Because of the centrality of the notion of "pretext" in the *McDonnell Douglas* framework, discrimination cases involving indirect evidence are sometimes referred to as "pretext cases."

**4.** Pub.L. No. 102–166, 105 Stat. 1071 (1991).

**5.** Because the applicability of *Price Waterhouse* depends upon a plaintiff's having direct evidence demonstrating that the defendant acted *at best* with "mixed motives," cases falling within the *Price Waterhouse* paradigm (direct evidence cases) are commonly labeled as "mixed motive" cases.

107, such proof by an employer does not provide a basis for avoiding *liability,* but does preclude any recovery of *damages* by the plaintiff and also bars certain important forms of injunctive relief, including reinstatement. *See* 42 U.S.C. § 2000e–5(g)(2)(B)(ii).

While it is clear, then, that Section 107 displaces the rule of *Price Waterhouse,* it is less clear whether Section 107 should have any application in cases traditionally litigated under *McDonnell Douglas.* The conceptual problem arises from the fact that the "a motivating factor" rubric of § 2000e–2(m)— which was incorporated in the district court's instructions here—is directly at odds with the established understanding of the plaintiff's burden of proof in the *McDonnell Douglas* framework, particularly as delineated in cases like *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506–07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

Within the *McDonnell Douglas* framework, a plaintiff bears the ultimate burden of persuading the trier of fact that the defendant's proffered reasons for the challenged job action are a pretext for discrimination, *i.e.,* that the "true reason" for the decision was discriminatory. *See Hicks,* 509 U.S. at 507–08, 515, 517, 113 S.Ct. 2742; *Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 16 (1st Cir.1994), *cert. denied,* 514 U.S. 1108, 115 S.Ct. 1958, 131 L.Ed.2d 850 (1995); *Woods v. Friction Materials, Inc.,* 30 F.3d 255, 260 (1st Cir.1994). To say that a particular motivation was the "true reason" for an action must mean at least that *absent* that motivation—that is to say, *but for* it —the action would not have occurred.[6] *Bibbs v. Block,* 778 F.2d 1318, 1321 (8th Cir.1985) (en banc). Thus, satisfying *McDonnell Douglas*'s burden of proof must entail persuading the finder of fact that the *determinative* reason for the adverse job action was *not* the rationale proffered by the defendant, but was, instead, discrimination. *See Loeb v. Textron, Inc.,* 600 F.2d 1003, 1019 (1st Cir.1979) (interpret-

ing *McDonnell Douglas* to require plaintiff to prove that discriminatory motive was "the determinative factor" or "but for" cause of adverse job action); *see also Hartsell v. Duplex Products, Inc.,* 123 F.3d 766, 772 (4th Cir.1997); *Simon v. City of Youngstown,* 73 F.3d 68, 70 (6th Cir.1995); *Wilson,* 55 F.3d at 130 (quoting *Miller v. CIGNA Corp.,* 47 F.3d 586, 598 (3d Cir.1995) (en banc)); *Maguire v. Marquette Univ.,* 814 F.2d 1213, 1216 (7th Cir.1987). Certainly, proving that discrimination was just *one* motivating factor among other, nondiscriminatory factors— which is all that is required to prove liability under § 2000e–2(m)—cannot suffice to establish that the discriminatory motive was causally determinative, and hence cannot be enough to establish liability and a right to recovery under *McDonnell Douglas.*[7] *See Goostree v. Tennessee,* 796 F.2d 854, 863 (6th Cir.1986) ("The mere showing that 'sex was a factor' rather than a 'but for' factor is insufficient to establish liability under Title VII.").

The incompatibility of § 2000e–2(m) with *McDonnell Douglas* is further demonstrated by the close relationship between § 2000e–2(m) and § 2000e–5(g)(2)(B). If § 2000e–2(m) applied to every disparate treatment case, then § 2000e–5(g)(2)(B) would be triggered in every such case in which the plaintiff prevailed (since the prevailing plaintiff necessarily would have proved a violation under § 2000e–2(m)). As noted above, § 2000e–5(g)(2)(B) permits a defendant to avoid damages and certain other consequences by demonstrating that it would have "taken the same action" absent a discriminatory motive. 42 U.S.C. § 2000e–5(g)(2)(B). But in cases where a plaintiff has prevailed under *McDonnell Douglas,* the factfinder necessarily will have found that discrimination was the "true reason" for the defendant's action. *See, e.g., Hicks,* 509 U.S. at 507–08, 113 S.Ct. 2742. In such cases, it would be absurd to ask the factfinder also to determine, as § 2000e–5(g)(2)(B) would re-

---

**6.** It would be contradictory to say that a particular motivation was the truly operative reason for an action if the action would have occurred whether or not that motivation existed.

**7.** Notably, even under § 2000e–2(m), proof that discrimination was just one motivating factor

among others would *not* automatically entitle the plaintiff to plenary recovery; such proof would only shift the burden to the defendant to prove that discrimination was *not* the but for cause of the adverse job action. *See* 42 U.S.C. § 2000e–5(g)(2)(B); *Price Waterhouse,* 490 U.S. at 244–45, 109 S.Ct. 1775 (plurality opinion).

quire, whether the defendant would have "taken the same action" *absent* a discriminatory motive.

The most plausible way to resolve the apparent conflict between § 2000e–2(m) and *McDonnell Douglas* is to limit the application of § 2000e–2(m) to "mixed motive" cases that fit the *Price Waterhouse* mold (cases in which the plaintiff has "direct evidence" of discrimination), and hold it inapplicable in "pretext" cases governed by *McDonnell Douglas*. This is a more sensible solution, in any event, than drawing the conclusion that Congress, in enacting § 2000e–2(m), intended effectively to abrogate the central tenets of the *McDonnell Douglas* canon.

The legislative history of the 1991 Act indicates that Section 107 was specifically intended to address the Supreme Court's holding in *Price Waterhouse* with respect to the standards of proof governing liability in "mixed motive" cases. *See* H.R.Rep. No. 102–40(I), *supra*, at 48, 1991 U.S.C.C.A.N. at 586 ("Section [107] of the legislation ... overrules one aspect of the Supreme Court's decision in *Price Waterhouse*."); H.R.Rep. No. 102–40(II), *supra*, at 16–17, 1991 U.S.C.C.A.N. at 709–10 (same); *see also* 137 Cong. Rec. S15476 (Oct. 30, 1991) (interpretive mem. submitted by Sen. Dole) (same); 137 Cong. Rec. H9529 (Nov. 7, 1991) (interpretive mem. submitted by Rep. Edwards) (same). Dicta in one Supreme Court decision and in two of our own prior decisions support this same conclusion. *See Landgraf*, 511 U.S. at 251, 114 S.Ct. 1483 ("[Section] 107 responds to *Price Waterhouse* ... by setting forth standards applicable in 'mixed

motive' cases."); *Tanca*, 98 F.3d at 681–82 ("Congress partially overruled *Price Waterhouse* in the 1991 Act by allowing a finding of liability and limited relief to plaintiffs in mixed motive cases."); *Smith v. F.W. Morse & Co.*, 76 F.3d 413, 419 n. 3 (1st Cir.1996) ("[T]he *Price Waterhouse* framework for proof of 'mixed motive' discrimination ... is somewhat changed under the 1991 Act."). There is absolutely no indication, on the other hand, that Congress intended the 1991 Act to overturn or even affect any aspect of *McDonnell Douglas* or its derivatives.[8]

It would be implausible to assume that Congress, in enacting § 2000e–2(m) to address one part of the Supreme Court's decision in *Price Waterhouse*, also intended, *sub silentio*, to eradicate the established legal landscape governing the litigation of disparate treatment cases. *Cf. Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 418–22, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986) (legislation overturning a recent Supreme Court decision involving one particular application of a longstanding judicially constructed rule could not be read as implicit rejection of the entire framework of the rule applied in the overturned decision). A far more reasonable proposition is that 42 U.S.C. § 2000e–2(m) was meant to describe the standard for establishing liability only in "mixed motive" cases, not in standard "pretext" cases governed by *McDonnell Douglas*. *See Fuller v. Phipps*, 67 F.3d 1137, 1143–44 (4th Cir.1995) ("Section 107 was intended to benefit plaintiffs in mixed-motive cases; it has nothing to say about the analysis in pretext cases such as this one.").[9] Under

8. At least one portion of the legislative history attempts to *harmonize* certain provisions of the 1991 Act (albeit not Section 107 in particular) with *McDonnell Douglas*. *See* H.R.Rep. No. 102–40(II), *supra*, at 7, 1991 U.S.C.C.A.N. at 699–700 (explaining that Section 105, which overturned *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), "is not inconsistent with the allocation of burden of proof in disparate treatment cases, as set forth in *McDonnell Douglas* ... and *Burdine* ...."). Another portion of the history suggests that Section 107 was simply intended to "restore the decisional law in effect in many of the federal circuits prior to the decision in *Price Waterhouse*," H. Rep. No. 102–40(I), *supra*, at 48, 1991 U.S.C.C.A.N. at 586, again suggesting that the

legislation was not intended to disturb *McDonnell Douglas* or its progeny.

9. *Cf. Fields v. New York State Office of Mental Retardation &* *Developmental Disabilities*, 115 F.3d 116, 123–24 (2d Cir.1997) (holding that § 107 of the 1991 Act does not require that every discrimination action be treated as a mixed motive case). *But cf. Harris v. Shelby Cty. Bd. of Educ.*, 99 F.3d 1078, 1083–84 (11th Cir.1996) (apparently applying *both McDonnell Douglas* and the rule of § 2000e–2(m) in a "pretext" case); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 935 n. 29 (3d Cir.1997) (dicta) (suggesting, without reaching the issue, that "there is considerable force to [the] view" that § 2000e–2(m) should apply to "pretext" and "mixed motive" cases

this reasoning, a district court errs by giving a jury instruction pursuant to § 2000e–2(m), unless the court determines that the plaintiff has adduced evidence of discrimination sufficient to take the case outside the *McDonnell Douglas* paradigm, and I would so hold.

Here, neither party has argued—and the district court never ruled—that this case is anything but a standard "pretext" case governed by the principles of *McDonnell Douglas*.[10] Yet, the district court, explicitly relying on 42 U.S.C. § 2000e–2(m), instructed the jury that the plaintiff's burden was merely to prove that his gender was "a motivating factor" in MDI's decision to fire him.[11] I would find (as the majority "assumes" without deciding) that MDI's objection to this instruction was well-founded. By instructing the jury that Carey was entitled to prevail upon a finding that discrimination had been merely "a motivating factor" in MDI's decision to terminate him, the district court erroneously understated the plaintiff's burden of proof under the governing legal framework.

## II.

But instructional error warrants reversal, of course, only if it was prejudicial. *See Federico v. Order of St. Benedict,* 64 F.3d 1, 3–4 (1st Cir.1995). The court's original "a motivating factor" instruction, standing alone, unquestionably prejudiced the defendant by materially understating the plaintiff's true burden of proof. The majority does not dispute this fact. The majority concludes, however, that the district court effectively

cured the error in its original instruction with its response to the jury's question about the meaning of "motivating factor." I disagree.

As a preliminary matter, it is important to understand that the court's so-called "supplemental instruction" was, at best, just that—a supplement to the original instruction, given in response to a question that came from the jury after it had already retired to deliberate. The court at no time instructed the jury that the original "a motivating factor" charge was incorrect, to be disregarded, or in any way problematic. Nor did the court advise the jury that the supplemental instruction, to the extent it might have been read as contradicting the original charge, was to be given precedence. Thus, in assessing the question of prejudice, we must ask not simply whether the supplemental instruction itself provided an accurate statement of the law (a question I would answer in the negative, *see infra*), but whether that instruction—even if it was correct—was sufficiently overriding and forceful in its import that we could confidently say that the jury applied the correct rule of law, *in spite of* the error contained in the original instruction. *Cf. Arthur D. Little, Inc. v. Dooyang Corp.,* 147 F.3d 47, 53–54 (1st Cir.1998) ("We assume the jury listens to and follows the judge's *entire* charge." (emphasis added)); *Tatro v. Kervin,* 41 F.3d 9, 18 (1st Cir.1994) (reversing jury's verdict where a particular instruction, though "standing alone, was proper," could have

alike), *cert. denied,* —— U.S. ——, 118 S.Ct. 299, 139 L.Ed.2d 230 (1997).

**10.** Indeed, at an earlier stage of this litigation, the district court, in denying MDI's motion for summary judgment, stated that Carey's case "rel[ied] on circumstantial evidence," rather than direct evidence, and held that the case would therefore be governed by *McDonnell Douglas.* Carey did not dispute this conclusion below and does not now dispute it on appeal. It is worth adding that if, at the commencement of trial, the court was uncertain as to how the plaintiff's case might play out, it could have deferred the mixed-motive/pretext determination until such time as its uncertainty could be dispelled. *See Starceski v. Westinghouse Elec. Corp.,* 54 F.3d 1089, 1098 (3d Cir.1995) (choice be-

tween "pretext" and "mixed motive" instruction need not be made at beginning of trial).

**11.** The relevant portion of the charge instructed as follows: "It is Mr. Carey's burden to prove by a preponderance of the evidence ... that his gender was a motivating factor in MDI's discriminatory [sic] firing of him.... If you find, based on the evidence, that Mr. Carey has not proven that his gender was a motivating factor in MDI's decision to fire him, then you must render a verdict for MDI, the defendant. If you find, however, based on the evidence that Mr. Carey has proven that his gender was a motivating factor in MDI's decision to fire him, then you must render a verdict for the plaintiff." MDI objected to this instruction, arguing that § 2000e–2(m) has no proper application in "pretext" cases governed by *McDonnell Douglas.*

prejudiced appellant when "taken together" with certain other problematic language).

In its supplemental instruction, the court stated to the jury that (a) "the plaintiff ... has the burden of establishing that it is more likely than not that gender was a motivating or determining factor in the firing of the plaintiff by the defendant"; (b) "it is for the jury to determine ... [whether] it is more likely than not that the defendant's decision to terminate the plaintiff was motivated by gender discrimination"; and (c) "If you find that the plaintiff was discharged for reasons other than his gender you must find for the defendant." This response, in my view, was not sufficient to obviate the prejudicial effect of the court's original instruction.

As the majority appears to agree, sentence (a) does not accurately describe the plaintiff's burden of proof under *McDonnell Douglas* and thus could not have been curative.

Sentence (b), considered in isolation, is not necessarily inconsistent with the established standards governing pretext cases, insofar as the "motivated by" formulation leaves *open* the critical issue of *how much* of a causative role discrimination must have played in the defendant's decisionmaking. But because the jury was never told that sentence (b) was to trump any conflicting statements in the original instruction, we cannot realistically assume that the jury did consider that sentence in isolation from the "a motivating factor" charge. To the contrary, it only seems fair to presume that the jury's understanding of sentence (b) was colored by the original "a motivating factor" instruction, and I do not see how we can discount the possibility that the jury thought it could find that the defendant was "motivated by" discrimination so long as gender animus was "a motivating factor." In any event, I do not think it possible to conclude that the jury, by virtue of sentence (b), must have understood that it could return a plaintiff's verdict only if

it found that discrimination had been *determinative* in the hospital's decision to fire Carey.

To a limited extent, sentence (c) might be thought to have lessened the prejudicial effect of the original instruction, by suggesting to the jury that a defendant's verdict was in order *if* the jury could "find" that the plaintiff's discharge was caused, to some unspecified degree, by nondiscriminatory reasons. But this is a far cry from saying that sentence (c) provided the jury with a correct understanding of the law. Keeping in mind, again, that the district court never told the jury to disregard the original "a motivating factor" instruction, it would seem more than likely that the jury understood the instructions, as a whole, to require it to return a verdict in Carey's favor if it found discrimination to be "a motivating factor" in his termination, *unless*—per sentence (c)—it "f[ou]nd" that Carey was fired "for reasons other than his gender." This is, of course, an incorrect understanding of the law: a finding that discrimination was "a motivating factor" is insufficient to satisfy the plaintiff's burden of proof in a pretext case, *regardless* whether the jury could or could not "find" that there were non-discriminatory reasons for the plaintiff's discharge.[12] *See Hicks*, 509 U.S. at 523–24, 113 S.Ct. 2742 ("Title VII does not award damages against employers who cannot prove a nondiscriminatory reason for adverse employment action, but only against employers who are proven to have taken adverse employment action by reason of (in the context of the present case) [gender].").

Thus, sentence (c), like (a) and (b), failed to provide the jury with an adequate recitation of the legal standard governing the plaintiff's burden of proof, and the supplemental instruction did not cure the erroneous "a motivating factor" instruction.

12. Thus, for example, if the jury had concluded that Carey had proved only that discrimination was "a motivating factor" in his discharge, but was not prepared to conclude, one way or the other, whether nondiscriminatory reasons played a true role, the jury should have returned a defendant's verdict. Yet, under the court's original instruction, even read in conjunction with sentence (c), the jury might have thought it was required to return a verdict for Carey based on its conclusion that discrimination had been "a motivating factor," since (by hypothesis) the jury would not have been prepared to conclude that Carey had been "discharged for reasons other than his gender."

### III.

The question remains whether MDI somehow waived any argument that it was prejudiced by the district court's "a motivating factor" jury instruction. The majority makes much of the fact that, at a few points in the colloquy following the jury's question, defense counsel appeared to accede to the giving of the supplemental instruction, and endorsed sentence (c) of that instruction in particular. It must be remembered, however, that this entire discussion was prompted by the jury's question about the meaning of "motivating factor," a phrase that had been adopted by the district court only over the defendant's duly-lodged objection. The colloquy preceding the court's giving of the supplemental instruction did not provide an apt occasion for MDI to reargue whether it had been proper for the district court to give the "a motivating factor" instruction in the first place.

It is only from this perspective that one can fairly understand what the majority refers to as MDI's "affirmative[ ] . . . approval of the supplemental instruction." In fact, in the course of finally acceding to the supplemental instruction—which, again, was really a response to the jury's question about language in the original instruction to which MDI had already objected—MDI expressly *reserved* its argument that the district court had incorrectly instructed the jury on the plaintiff's burden of proof. This is what MDI's counsel actually said:

> although, you know, our position [is] that it should be a "determining/but for" standard, and *I don't want to waive that argument,* I think that this [the court's proposed response to the jury] is acceptable *in light of the court's prior ruling.*[13]

I can see nothing in this statement that compromised the defendant's ability to argue, on appeal, that it was prejudiced by the court's "a motivating factor" instruction.

It is true, as the majority observes, that MDI's counsel at one point did explicitly endorse sentence (c) of the supplemental instruction as a correct statement of the law.

I have tried to explain above why I believe (c) was *not* a fully accurate statement. It is a bit more difficult to say, however, just what effect MDI's concession should have. On the one hand, it certainly should bar MDI from arguing that the inclusion of sentence (c) in the supplemental instruction was *itself* reversible error; but that is *not* a position that MDI has taken in this appeal. On the other hand, MDI's endorsement of sentence (c) surely cannot be taken as a waiver of its argument that the "a motivating factor" instruction constituted prejudicial error. MDI's counsel at no time conceded that the supplemental instruction, with or without sentence (c), was sufficient to *cure* the asserted error in the original charge. In fact, counsel explicitly noted for the record that the hospital did not want to waive its original objection.

In these circumstances, I see no reason that the concession of MDI's counsel as to statement (c) should require this court, in assessing whether MDI was prejudiced by the "a motivating factor" charge, to conclude that statement (c) effectively cured that erroneous instruction. A contrary outcome, it seems to me, would create a rule of waiver that imposes on trial counsel a "burden of perfection" as "unrealistic" as the burden that the majority asserts would befall the trial court if we were to call for a new trial in this case.

For all of the reasons stated, I would vacate the judgment and remand this case for a new trial.

---

13. By "prior ruling," the defendant was of course referring to the court's decision to give the "a motivating factor" instruction in the first place.