Ralph WILLIAMS

v.

RAYTHEON COMPANY

Civil Action No. 97-10925-RGS.

United States District Court,
D. Massachusetts.

April 6, 1999.

---

Ira H. Zaleznik, Lawson & Weitzen, Boston, MA, for Plaintiff.

James F. Kavanaugh, Jr., Stephen S. Churchill, Conn, Kavanaugh, Rosenthal, Peisch & Ford, Ten Post Office Square, Boston, MA, for Defendant.

### MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

STEARNS, District Judge.

Ralph Williams contends that the defendant Raytheon Company terminated his employment because of his gender and his age, and in retaliation for his cooperation with a government investigation. Raytheon maintains that Williams was terminated for insubordination and that his state discrimination claims are in any case time-barred. Raytheon moves for summary judgment.[1]

---

**1.** Williams' Complaint asserts the following claims: Count I—violations of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623(a), the Massachusetts anti-discrimination statute, G.L. c. 151B, and the Equal Employment Opportunities Act, 42 U.S.C. § 2000e–2; Count II—retaliatory discharge in violation of Massachusetts public policy; Count III—breach of the implied covenant of good faith and fair dealing. At oral argument, counsel waived Count III as inapplicable to plaintiff's case.

## BACKGROUND

The following facts are taken from the Complaint, Williams' deposition and affidavit, and Raytheon's Statement of Undisputed Facts.

Williams joined Raytheon in 1986 as manager of Employee Communications and Community Relations in the Missile System Division. In 1992, Williams was promoted to the position of Director of Internal Communications at Raytheon's corporate offices in Lexington, Massachusetts. Williams was responsible for writing, editing and producing Raytheon's corporate newspaper and other company publications. Throughout his tenure at Raytheon, Williams received outstanding reviews.

In 1993, Raytheon hired Elizabeth Allen as Vice President of Corporate Communications. Allen oversaw Raytheon's external and internal communications and was Williams' direct supervisor. Williams claims that Allen made comments to the effect that Raytheon had too many "old, white men"; she attempted to remove from company publications the proclamation that Raytheon was an equal opportunity employer; she expressed the belief that older employees made too much money; she told Williams that some of his decisions were based on testosterone; she made comments about particular men being handsome and young; she said that only "broads" knew how to work; she stated that she intended to hire only women; she requested that the company newspaper be redesigned to appeal to younger people; she indicated that she intended to replace a older woman with a "young, white boy;"[2] and she forced Williams to give credit for some of his work to a

female subordinate.[3] Allen disputes all of these allegations.

During the summer of 1994, Raytheon News published a story about the bestowal of a government contract on Beech Aircraft, a Raytheon affiliate referred to as BASI. The story was inadvertently printed before the contract was actually awarded. Allen had approved the publication of the story. A competing vendor complained, and a government investigation ensued.

Williams was asked by Raytheon's Legal Department to prepare an affidavit explaining the circumstances surrounding the BASI incident. Williams Dep., at 113–114. He did so, but before submitting the affidavit to the Legal Department, Allen counseled him to redo it using hers as a model. Id., at 114–115. Allen's affidavit stated that Williams' secretary had failed to stamp "draft" on the story, causing the problem. Williams claims that this was untrue. Williams Aff. ¶ 14. Williams redrafted his own affidavit, but refused to place any blame on his secretary. Williams Aff. ¶ 15.

Williams states that he also told the government investigator the "truth." Allen was not present during the interview, and he never disclosed to her what he had told the investigator. Williams Dep., at 137–138, 147. After interviewing Williams, the investigator interviewed Allen and Joyce Melikian. Id., at 135–36. Williams was not present during Allen's interview, and he does not know what was said. Id. Williams claims that "[a]fter the investigator left Raytheon, Allen was furious with [him]." Williams Aff. ¶ 16.

Allen reminded Williams that she decided his bonuses and stock options and that

2. Williams claims that the woman was Doris Relf, an older employee. Williams states that Allen required Relf to use a complicated desktop publishing program to "encourage" her to retire. Allen replaced Relf with "a man in his twenties with no prior experience in the computer applications that the job required." Williams Aff. ¶ 8, 9. Williams does not specify Relf's race.

3. In late 1994, Allen assigned Williams the task of creating an international marketing brochure to be published in nine languages. Allen allegedly directed that Williams' assistant, Joyce Melikan, receive the credit for the project. In a meeting with Raytheon's Chief Executive Officer, Allen praised Melikan for the success of the project. Williams Aff. ¶ 10.

he worked for her. Allen also told Williams that the investigator planned to return to interview Dennis Picard, Raytheon's CEO. Williams Dep., at 141, 143–48. The government eventually determined that Raytheon had done nothing improper. Allen Aff., Ex. 2, at ¶ 4.

Some two months after the BASI incident, Allen told her staff during a meeting that "Wil[liams] is not interested in loyalty. He's only interested in the truth." Williams Dep., at 149–150. After giving Williams a bonus check six months later, Allen told him that she was pleased with his performance "since the BASI incident." Id., at 149.

On June 8, 1995, Allen ordered Williams in writing to complete three tasks. Allen Aff. ¶ 6. Williams responded with a four-page memorandum that Allen regarded as hostile, sarcastic, and insubordinate. Id., at ¶ 7.[4] Allen then ordered an audit of Williams' department focusing on purchases and other expenditures authorized by Williams. Williams Aff. ¶ 25.

On June 23, 1995, Williams met with Allen in her office. Allen states that during the meeting she felt physically threatened by Williams. Allen Aff. ¶ 8. Williams admits that he was "emotional," but insists that nothing menacing occurred. Williams Dep., at 183–184, 190; Williams Aff. ¶ 20. After the meeting, Allen ordered an audit of the software licenses for computer programs used in Williams department. Williams was later told by the security department that the audits had found no irregularities. Williams Aff. ¶ 26.

After the meeting, Williams complained to Gail Philip Anderson, Raytheon's Senior Vice President for Human Resources that Allen was biased against him because of his age and his gender. Williams Dep., at 191–192; Williams Aff. ¶ 21. Anderson directed Timothy Schultz, Raytheon's Manager for Corporate Equal Employment Opportunity Programs, to investigate Williams' complaint. Schultz concluded that Allen had not discriminated against Williams or anybody else.[5] Schultz Aff. ¶ 4. Schultz also concluded that Williams had acted in an insubordinate manner towards Allen and recommended to Anderson that Williams be fired. Id. Anderson decided to terminate Williams after reviewing Schultz's findings with Allen. Anderson Aff. ¶ 3. Allen concurred in the decision. Allen Aff. ¶ 9.

On July 11, 1995, Williams was informed that he was being "permanently suspended" for insubordination. The following day, Williams went to the MCAD and completed an intake interview form and complaint.[6] Williams Dep., at 213. In his deposition, Williams testified unequivocally that he was permanently terminated on July 11, 1995.

Q. Subsequently, there were discussions between counsel for you and counsel for Raytheon about the possibility of some severance agreement. Isn't that correct?

A. That happened later, yes.

Q. And was it your understanding that the reason that Raytheon didn't terminate you earlier was to see whether

---

4. In the preamble to his memorandum responding to Allen, Williams wrote that:

> [b]efore I respond to those directions, I must note that your specific desire to single me out and establish a "paper trail" intrigues me, since the methodology is normally reserved for building and documenting disciplinary cases. For that reason, I feel offended and embarrassed. The existence of your memos swept through the department, creating the faulty impression that I have in some way been remiss in my duties, which is totally untrue in any form.

Williams Aff., at Ex. B

5. Although Raytheon had a written policy that personnel complaints were to be treated as confidential, Williams claims that Schultz disclosed the details of his complaint to Allen and to Pat Coulter. Williams Aff. ¶ 23.

6. The MCAD scheduled Williams for an interview on August 11, 1995. Williams chose not to attend the interview on advice of his counsel. Williams Dep., at 213–214.

some agreement could be worked out between you and the company?

A. No.

Q. That's not your understanding.

A. I was told that at the end, but prior to that, I was not told that.

Q. Do you have any understanding as to why you weren't terminated earlier?

A. I was terminated on—permanently terminated—it was my impression I was permanently terminated on July 11th. That was my impression. In fact, it was confirmed in a phone call to Mr. Gasperini, who referred me to a man named Jay Minihan when I asked, "What does permanently suspended mean?"

"It means, " 'You're fired.' "

Q. When did that phone call take place?

A. Shortly after I was permanently suspended.

Q. So sometime in July '98?

A. Yeah, I guess.

Q. I'm sorry?

A. Yes.

Q. You understood when you were put on permanent suspension you were in reality terminated.

A. Yes. I did not understand the term. I asked what the term meant. I asked Mr. Gasperini what the term meant. I never got an answer what the term meant. I've never heard anyone use the term "permanently suspended" prior to that or since then, except at this Raytheon thing.

Q. But Mr. Minihan told you on the phone call you just described that it meant, in effect, you were fired.

A. That's right.

Q. And that's the way you understood it after you talked to Mr. Minihan?

A. Yes.

Williams Dep., at 42–44. Williams states in his affidavit that his deposition testimo-

ny was "mistaken" and that Minihan (an employee in Raytheon's Human Resources Department), informed him that "indefinite suspension" meant termination, "probably in August." Williams Aff. ¶ 29.

Williams accepted a position with Systems Resources Corporation in September of 1995. Williams filed a Charge of Discrimination against Raytheon with the MCAD on February 2, 1996. Defendant's Ex. 6.

## DISCUSSION

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine issue as to any material fact, and [where] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Gaskell v. Harvard Co-op. Society*, 3 F.3d 495, 497 (1st. Cir.1993). A dispute of fact is only genuine if there is sufficient evidence to permit a reasonable jury to resolve the point in the nonmoving party's favor. *NASCO, Inc. v. Public Storage, Inc.*, 29 F.3d 28, 32 (1st Cir.1994). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted).

*Count I—Age and Sex Discrimination Under G.L. c. 151B*

To maintain an action under state law, Williams was required to file a claim with the MCAD within six months of the alleged discriminatory act. G.L. c. 151B, § 5; *Andrews v. Arkwright Mut. Ins. Co.*, 423 Mass. 1021, 1021–1022, 673 N.E.2d 40 (1996). To satisfy the limitations period on his c. 151B claim, Williams' termination would have had to occur on or subsequent to August 5, 1995. Williams testified at his deposition that he understood that he was terminated on July 11, 1995.[7] Although Williams later "correct-

---

**7.** Citing *Wheatley v. American Tel. & Tel. Co.*, 418 Mass. 394, 397–398, 636 N.E.2d 265 (1994), Williams argues that an ambiguous

notice of termination, like Raytheon's notice of "indefinite suspension," does not start the limitations period running for purposes of

ed" his testimony in an affidavit submitted in opposition to Raytheon's summary judgment motion, this belated revision is insufficient to defeat summary judgment. "[A] party cannot create a disputed issue of fact by the expedient of contradicting by affidavit [his own] statements previously made under oath at a deposition." *O'Brien v. Analog Devices, Inc.*, 34 Mass.App.Ct. 905, 906, 606 N.E.2d 937 (1993); *Morrell v. Precise Engineering, Inc.*, 36 Mass.App. Ct. 935, 937, 630 N.E.2d 291 (1994) (same). See also *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4–5 (1st Cir.1994). *Cf. Spilios v. Cohen*, 38 Mass.App.Ct. 338, 340–341 n. 2, 647 N.E.2d 1218 (1995) (noting the Massachusetts tendency to follow the federal practice of disregarding eleventh hour affidavits contradicting earlier statements made under oath).

*Federal Sex and Age Discrimination Claims*

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme Court set out a burden-shifting framework to be used in evaluating employment discrimination claims. According to this framework, if a plaintiff succeeds in establishing a prima facie case of discrimination, a presumption of discrimination arises. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell*, supra at 802; *Burdine*, supra at 252–253, 101 S.Ct. 1089. See also *Sinai v. New England Tel. and Tel. Co.*, 3 F.3d 471, 473–474 (1st Cir.1993). If the employ-

er comes forward with a nondiscriminatory explanation, the *McDonnell–Burdine* presumption is rebutted and disappears from the case. See *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510–511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The plaintiff then has the opportunity to demonstrate "through presentation of his own case and through cross-examination of the defendant's witnesses, 'that the proffered reason was not the true reason for the decision,' and that [age or sex discrimination] was." Id. at 507–508, 113 S.Ct. 2742 (quoting *Burdine*, supra at 256, 101 S.Ct. 1089). See also *Mesnick v. General Elec. Co.*, 950 F.2d 816, 825 (1st Cir.1991).

The *McDonnell–Burdine* framework addresses only the formal allocation of the burdens of production; the "ultimate burden of persuasion" remains at all times with the plaintiff. *St. Mary's*, 509 U.S. at 511, 113 S.Ct. 2742. Thus, a plaintiff is required to produce specific facts that would enable a jury to find that the reasons proffered by the employer for his discharge were a pretext to conceal discrimination. *Olivera v. Nestle Puerto Rico, Inc.*, 922 F.2d 43, 48 (1st Cir.1990). The plaintiff must do more than simply question the employer's reasons or motives. *Gadson v. Concord Hosp.*, 966 F.2d 32, 34 (1st Cir.1992). He must put forward "definite, competent evidence fortifying [his] version of the truth."[8] *Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476, 479 (1st Cir.1993). "Direct or indirect evidence of discriminatory motive may do, but 'the evidence as a whole must be sufficient for a reasonable fact finder to infer that the employer's decision was motivated by age [or gender] animus.'" *LeBlanc v.*

---

151B. However, Williams' deposition testimony makes clear that he was unambiguously told that Raytheon had fired him. The fact that Williams complained to the MCAD on July 12, 1995, is telling confirmatory evidence.

**8.** There is no absolute rule that a discrimination plaintiff must adduce evidence in addition to that comprising the prima facie case and the rebuttal of defendant's justification in

order to prevail either at the summary judgment stage or at trial. Rather, the evidence as a whole, whether direct or indirect, must be sufficient for a reasonable fact finder to infer that the employer's decision was motivated by [discriminatory] animus. If no such inference can be drawn, summary judgment is appropriate.

*Villanueva v. Wellesley College*, 930 F.2d 124, 128 (1st Cir.1991).

*Great American Ins. Co.*, 6 F.3d 836, 843 (1st Cir.1993), (quoting *Connell v. Bank of Boston,* 924 F.2d 1169, 1172 n. 3 (1st Cir. 1991)).[9]

■■■ To establish a prima facie case of age discrimination, a plaintiff must demonstrate that (1) he was at least forty years of age; (2) he met the employer's legitimate job performance expectations; (3) he experienced an adverse employment action; and (4) his job responsibilities were assumed by another person with similar skills, thus demonstrating the employer's continuing need to fill the position. *Keisling v. SER–Jobs for Progress, Inc.*, 19 F.3d 755, 760 (1st Cir.1994). Cf. *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) ("[T]hat an ADEA plaintiff was replaced by someone outside the protected class is not a proper element of the *McDonnell Douglas* prima facie case"). To establish a prima facie case of gender animus, Williams "must show that (1)[he] is a member of a protected class; (2)[he] was performing [his] job at a level that rules out the possibility that [he] was fired for inadequate job performance; (3)[he] suffered an adverse job action by [his] employer; and (4)[his] employer sought a replacement for [him] with roughly equivalent qualifications." *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 15 (1st Cir. 1994). See also *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 118 S.Ct. 998, 1001, 140 L.Ed.2d 201 (1998); *Carey v. Mt. Desert Island Hospital,* 156 F.3d 31, 34 (1st Cir.1998).

■■■ With respect to his age discrimination claims, Williams has arguably established a prima facie case. He has not,

however, shown that he was replaced by someone who was "significantly younger." A perfected prima facie case ordinarily entitles a plaintiff to a presumption of discrimination, thus forcing the employer to come forward with a nondiscriminatory explanation, but not always. The presumption must be anchored in reality. "As the very name 'prima facie case' suggests, there must be at least a logical connection between each element of the prima facie case and the illegal discrimination for which it establishes a 'legally mandatory, rebuttable presumption.'" *O'Connor,* 517 U.S. at 311–312, 116 S.Ct. 1307. Stated differently, the facts of the prima facie case must have sufficient probative force to support a discriminatory inference.

> In the age discrimination context, such an inference can not be drawn from the replacement of one worker with another worker insignificantly younger. Because the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class.

*Id.,* at 313, 116 S.Ct. 1307. Williams was 51 years old when he was terminated. Alan Csiky, his replacement, was 2½ years younger. While Williams has laid the foundation of a prima facie case of age discrimination, its pilings are too weak to support the *McDonnell Douglas* presumption. Thus, the age discrimination claim fails.

---

9. The *McDonnell–Burdine* framework does not apply where a plaintiff is able to produce direct evidence of discrimination. No such evidence has been offered in this case. In fact, the only evidence of discriminatory intent appearing in the record are the offensive comments that Williams attributes to Allen. These remarks, if true, invite the inference that Allen's hostility to Williams was motivated by her subjective beliefs about "old, white men" rather than by his insubordinate behavior. While it is true that in *Shorette v. Rite Aid of Maine, Inc.*, 155 F.3d 8, 13 (1st Cir. 1998), allegedly discriminatory remarks are analyzed under the heading of direct evidence, the conclusion reached is the same as here where the putative speaker is not the initiator of the decisional process. In any event, both parties in their briefs use a *McDonnell–Burdine* analysis.

That Williams was replaced by an employee of the same gender, however, does not necessarily defeat his sex discrimination claim. See *Hannon v. Chater*, 887 F.Supp. 1303, 1313 (N.D.Cal.1995) ("Evidence that person hired is of the same sex or race as the plaintiff 'is extremely helpful to the defendant's rebuttal in supporting an nondiscriminatory justification for its employment action. However, it would be a mistake to assume that such evidence amounts to an ironclad defense.' "). A prima facie case requires only that the discharged employee be replaced by someone "with roughly equivalent qualifications." *Smith*, 40 F.3d at 15. But see *Carey*, 156 F.3d at 34 ("There is no real dispute that *Carey* has established a prima facie case, as he has shown that he had a satisfactory job performance record but was terminated and replaced by a woman").

Shouldering its burden on the gender discrimination claim, as it must, Raytheon maintains that Williams was fired for insubordination. There is no dispute that this reason, if true, would justify Williams' termination. Williams must therefore demonstrate that the reason given is a pretext for discrimination. "[A] reason cannot be proved to be a 'pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's*, 509 U.S. at 515, 113 S.Ct. 2742. A reason is not shown false by merely questioning the employer's credibility. *Woods v. Friction Materials, Inc.*, 30 F.3d 255, 260–261 n. 3 (1st Cir.1994). While Williams claims that Allen told him that she "wanted him out of Raytheon," he has put forth no evidence that she wanted him out because of his gender rather than because of his confrontational style. The offensive remarks that Williams attributes to Allen (which are uncorroborated) are meant to imply that Allen harbors discriminatory animus towards older persons generally, older men in particular, minorities, younger people, and women, while at the same time she treats women preferentially over men. The only alleged statement that lends support to Williams' gender claim is Allen's comment that she intended "to hire only women." There are two undisputed examples, however, in the record to the contrary. Allen, by Williams' own account, replaced an older woman "with a man in his twenties," and replaced him with another man. See *Gagne v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309, 314 (6th Cir.1989) (an isolated, ambiguous remark by a supervisor is insufficient to create a material issue as to whether an employer discriminated); *Leichihman v. Pickwick Intern.*, 814 F.2d 1263, 1271 (8th Cir.1987) (jury properly instructed that a single offensive statement, standing alone, did not necessarily prove an intent to discriminate). Moreover, statements by decisionmakers who are not themselves a moving force in the decision to terminate an employee are ordinarily insufficient to prove an employer's discriminatory animus. *Shorette*, 155 F.3d at 13. Williams admits that it was he, and not Allen, who precipitated the Human Resources investigation that ultimately led to his dismissal. Williams Aff. ¶ 21. And in response to the affidavits of Schultz and Anderson, stating that it was Anderson, and not Allen, who made the decision to fire him, Williams offers nothing more than his personal opinion that their declarations are "highly suspect" and inconsistent with what he knew about Raytheon's employment policies. Williams Aff. ¶ 28. See *Moreau v. Local Union No. 247*, 851 F.2d 516, 519 (1st Cir.1988) ("[A] mere challenge to the credibility of a movant's witnesses without any supporting evidence does not raise a trialworthy issue of fact").

The total picture is not unlike the one in *Alvarez–Fonseca v. Pepsi Cola of Puerto Rico Bottling Co.*, 152 F.3d 17, 25–26 (1st Cir.1998).

But even assuming that a reasonable jury could find Pepsi's explanation to be pretextual, Alvarez failed to show that Pepsi discriminated against him because

of his age. Alvarez makes much of the language from *St. Mary's Honor Center* stating that "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if the disbelief is accompanied by a suspicion of mendacity), *may*, together with the elements of the prima facie case, … *permit* the trier of fact to *infer* the ultimate fact of intentional discrimination." 509 U.S. at 511, 113 S.Ct. 2742 (emphasis added). However, not only is a jury not required to infer discrimination from a showing of pretext together with the evidence underlying the prima facie case, but the facts will most often not permit a jury to do so. That is certainly the case here, where both the prima facie case and the showing of pretext are weak, and there is no independent evidence that would reasonably allow the inference that age discrimination was the motivation for Pepsi's actions.

So too is the case with respect to Williams' gender discrimination claim.

*Count II—Retaliatory Termination*

Count II alleges a Massachusetts common law claim of wrongful termination, brought under the public policy exception to the rule that ordinarily permits an employer to terminate an at-will employee for any reason (or for no reason at all). See *Jackson v. Action for Boston Community Development, Inc.*, 403 Mass. 8, 9, 525 N.E.2d 411 (1988). The Supreme Judicial Court has, in dicta, suggested that it might, in some circumstances, authorize a "whistleblowing" at-will employee to proceed under this exception. *Mello v. Stop & Shop Cos.*, 402 Mass. 555, 560 n. 6, 524 N.E.2d 105 (1988). Whether Williams should be permitted to do so, is best decided by the courts of Massachusetts. 28 U.S.C. §§ 1367(c)(1) and (3); *Carnegie– Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988).

### ORDER

For the foregoing reasons, defendant's motion to dismiss count I of the Complaint is *ALLOWED*. The court declines jurisdiction over Count II, which will be *REMANDED* to the Superior Court for further proceedings.

SO ORDERED.