Jacqueline T. BENHAM, Plaintiff,

v.

LENOX SAVINGS BANK, Defendant.

No. Civ.A. 98–30004–MAP.

United States District Court,
D. Massachusetts.

Nov. 3, 2000.

133

Richard J. O'Brien, Pittsfield, MA, Daniel R. Solin, Pittsfield, MA, for Jacqueline T. Benham, plaintiff.

James E. Wallace, Jr., Thomas J. Scannell, Bowditch & Dewey, Worcester, MA, for Lenox Sav. Bank, defendant.

Paul D. Snyder, F.D.I.C., Braintree, MA, for F.D.I.C., movant.

## MEMORANDUM REGARDING OPPOSITION TO THE REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### (Docket No. 53)

PONSOR, District Judge.

## I. INTRODUCTION

Before this court is defendant's Motion for Summary Judgment on plaintiff's claim of discrimination in violation of Section 510 of the Employee Retirement Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA").

On February 15, 2000, Magistrate Judge Kenneth P. Neiman issued a Report and Recommendation recommending allowance of defendant's Motion for Summary Judgment on claims of duress and fraudulent misrepresentation, and denial of defendant's Motion for Summary Judgment on the ERISA violation.[1] See Report and Recommendation on Defendant's Motion for Summary Judgment ("Report and Recommendation"), Docket No. 81. Defendant seeks review of its summary judgment claim on the ERISA violation. After a thorough review of the record this court will adopt the Report and Recommendation with respect to the ERISA claim.

---

1. In her written opposition below, plaintiff consented to the entry of summary judgment as to claims that the bank had violated ERISA fiduciary duties, that a settlement agreement as to a benefits plan was void under ERISA and that the bank had violated ERISA by offering inconsistent benefits under a single plan. Report and Recommendation at 8. At oral argument, Plaintiff consented to summary judgment as to her claim that the bank discharged her with an intent to interfere with insurance benefits in violation of ERISA. See id.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A "genuine" issue is one that reasonably could be resolved in favor of either party, and a "material" fact is one that affects the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the moving party (here defendant) can show an absence of evidence to support the nonmoving party's claim, the nonmoving party bears the burden of going beyond the pleadings to demonstrate the existence of a genuine issue for trial. *Id.* at 256, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202. *See also Tardie v. Rehabilitation Hosp. of Rhode Island,* 168 F.3d 538, 541 (1st Cir. 1999).

In reviewing a motion for summary judgment, the court must view all the evidence in the light most favorable to the nonmoving party, "drawing all reasonable inferences in that party's favor." *Thomas v. Eastman Kodak Co.,* 183 F.3d 38, 42 (1st Cir.1999), *cert. denied,* — U.S. —, 120 S.Ct. 1174, 145 L.Ed.2d 1082 (2000). In employment discrimination cases, courts must "exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent." *Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46 54 (1st Cir.2000); *accord, Hodgens v. General Dynamics Corp.,* 144 F.3d 151, 167 (1st Cir.1998) ("where a plaintiff ... makes out a prima facie case and the issue becomes whether the employer's ... reason is a pretext for discrimination, courts must be particularly cautious about granting ... summary judgment") (internal quotations omitted). Nevertheless, summary judgment may be appropriate "if the nonmoving party rests on 'conclusory allegations, improbable inferences, and unsupported speculation.'" *Wooster v. Abdow Corp.,* 1996 WL 131143, *1 (D.Mass.1996) (quoting *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990)). *See also Conward v. Cambridge Sch. Comm.,* 171 F.3d 12, 18 (1st Cir.1999) (refusing, on motion for summary judgment, "to indulge rank speculation or unsupportable hyperbole").

## III. FACTUAL BACKGROUND

The facts of this case are ably set forth in Magistrate Judge Neiman's Report and Recommendation below. Report and Recommendation of the U.S. Magistrate Judge, Docket No. 81 ("Report and Recommendation"). This court adopts and incorporates his findings in all relevant respects; however, given the nature of the defendant's objection and recent decisions re-evaluating the evidentiary standard to be applied in employment discrimination cases, it will be helpful to recite the facts in some detail. These facts, taken in the light most favorable to the plaintiff, will be addressed in two parts. This memorandum will discuss, first, the facts surrounding defendant's decision to reduce pension entitlements and, second, the circumstances surrounding plaintiff's termination.

Defendant, Lenox Savings Bank, ("Lenox" or "the Bank") is organized under the laws of Massachusetts with a principal place of business in Lenox, Massachusetts. Defendant's Statement of Material Facts, Docket No. 54 at 1. Plaintiff Jacqueline T. Benham ("Benham") resides in Lenox, Massachusetts. Benham is 57 years old and started working at the Bank, intermittently, in 1961. Affidavit of Jacqueline T. Benham ("Benham Affidavit"), Docket No. 63 at 2, Plaintiff's Statement of Material Facts, Docket No. 60 at 1. From 1976 to 1997, Benham worked full time at the Bank in various capacities. *Id.* At the time of her termination, Benham was Senior Vice President of the Bank, one of

three senior ranking officers and the Bank's second longest employee. *Id.*

### A. Benham's Retirement Benefits And The Bank's Efforts To Cut Costs By Reducing Benefits

During her tenure at the Bank, Benham had acquired a number of retirement benefits. In 1981 Benham enrolled in the Bank's Defined Benefit Pension Plan, administered by the Savings Bank Employees Retirement Association ("SBERA plan"). Plaintiff's Statement of Material Facts, Docket No. 60 at 3. At the time of her enrollment, the SBERA plan provided for a life annuity vesting at the age of 65. Benham Affidavit, Exhibit 1, Docket No. 64 ("Plaintiff's Exhibits"). Under the terms of the SBERA plan, plaintiff would receive 1.75% of average compensation per year for service up to twenty-five years and 6% of average annual compensation in excess of $48,756. *Id.* In addition to the SBERA plan, Benham enrolled in a deferred compensation program, known as the "Brick Plan" in July of 1988. Plaintiff's Exhibits Volume I, Docket No. 64, Exhibit 3; Plaintiff's Affidavit, Docket No. 63 at 5; Defendant's Statement of Undisputed Facts, Docket No. 54 at 9. The Brick Plan had been initiated in 1986 by former Bank president, Stanley T. Ryba ("Ryba"). In accord with the Brick Plan, the Bank would pay Benham $24,248 per year for five years once Benham reached 65. Plaintiff's Exhibits Volume I, Docket No. 64, Exhibit 3. In turn, Benham agreed to serve in an executive capacity for a minimum of five years, after which her benefits would be fully vested. Finally, Benham had enrolled in the Bank's 401(k) plan for which the Bank was required to pay $2000 per year. Plaintiff's Affidavit Docket No. 63 at 6.

In February of 1993, Michael A. Christopher ("Christopher") succeeded Ryba as the Bank's President. From the outset of Christopher's presidency, plaintiff, one of the three most senior employees at the Bank, worked closely with him. Report and Recommendation, Docket No. 81 at 3. In doing so, she observed not only Christopher's method of operation, but the concerns he expressed about expenses associated with employee benefits. *Id.* At one point Christopher stated in writing that, to his mind, one of the Bank's benefit plans "was becoming prohibitive and was having considerable consequences to the earnings of the Bank." Plaintiff's Exhibits Volume I, Docket No. 64, Exhibit 5.

About one year after becoming President, Christopher reviewed the Bank's adoption by the Board of Trustees of the Brick Plan and concluded with counsel that the plan had not been properly adopted. Defendant's Statement of Undisputed Facts, Docket No. 54 at 11. Christopher advised the Brick Plan participants, including Benham, of the problems with the plan and proposed alternative benefits to replace it. *Id.* Executive Vice President Wayne Lemanski ("Lemanski") rejected the proposal and, in May of 1994, brought suit against the Bank to enforce his benefits under the plan.[2] Id.

While Lemanski's case was pending, Christopher made a specific written proposal warning that the Lemanski litigation might render the Brick Plan agreements unenforceable. Defendant's Statement of Undisputed Facts, Docket No. 54 at 12. As an alternative to possible loss of benefits altogether, Christopher offered the participants the option of receiving seventy percent of the benefits offered under the Brick Plan. *Id.* In return, the participants were required to sign a paper acknowledging that the Brick Plan was "void and without effect." Plaintiff's Exhibits Volume I, Docket No. 64, Exhibit 10. On July 13, 1995, Plaintiff signed the Settlement Agreement. *Id.*

---

**2.** In the Lemanski litigation, the Brick Plan was determined to be properly adopted by the Board of Trustees and its repudiation a violation of ERISA. *See Lemanski v. Lenox Sav. Bank,* 95–30074–MAP, 1996 WL 253315 (D.Mass. Apr.12, 1996).

Later in 1995, Christopher authorized an analysis of the Bank's SBERA plan. The analysis revealed (i) that the Bank had the most generous plan of the approximately one hundred banks in the SBERA system and (ii) that the Bank's SBERA plan failed to provide Christopher and John S. Rys ("Rys"), the Bank's Treasurer, with retirement benefits comparable to those of presidents and treasurers at similarly-sized banks. Appendix to Defendant's Motion for Summary Judgment, Docket No. 55, Exhibit 3. Christopher thereupon expedited amendments to the Bank's SBERA Plan benefits for both general employees and senior executives. Specifically, the Bank reduced its contribution to employee SBERA plans, including Benham's, from 1.75% to 1.25% of an employee's average annual compensation on the date of their retirement. Defendant's Statement of Undisputed Facts, Docket No. 54 at 5.

In addition, Christopher implemented the Senior Employee Retirement Plan ("SERPS"). *Id.* at 6. SERPS provided Christopher with retirement benefits at 65% of his final average compensation and provided Vice President Rys benefits at 60% of final average compensation. *Id.* at 8. The SERPS plan was not extended to Benham—the only other qualifying employee—because her retirement benefits already placed her at the desired 60% range. *Id.* at 7. In making the amendments, the Bank claims to have saved approximately $1,500,000. Report and Recommendation, Docket No. 81 at 6. After factoring in the additional pension packages to Christopher and Rys, however, the Bank's total savings were about $767,000. *Id.* at n. 2.

In the SBERA analysis, plaintiff was identified as the person with the highest "present value" benefit owed, exceeding the next closest (dollar-wise) employees by a significant amount. Plaintiff's Exhibits Volume 1, Docket No. 64, Exhibit 11. It appears that the lump sum value of plaintiff's SBERA benefits at age sixty-five under the pre-amendment (1.75%) formula

was approximately $545,520, but only $493,134 under the post-amendment (1.25%) formula. Plaintiff's Statement Of Material Facts, Docket No. 60 at 14. It also appears that on October 15, 1997, the date plaintiff was fired, the lump sum value of her SBERA benefits was only $262,426. *Id.*

### B. Benham's Termination

#### 1. Benham's Performance Evaluations During Christopher's Presidency

In 1993, at the time Christopher had taken over as president of the Bank, Benham's evaluations indicated a high level of performance. In June 21, 1993 an evaluation conducted by Christopher indicated that Benham's job performance ranked "above acceptable standards" or "outstanding" in twenty-three of twenty-five categories. Defendant's Statement of Undisputed Facts, Docket No. 54 at 2. These positive evaluations continued through 1996 with Benham receiving "above acceptable standards" in eighteen categories in 1994, fifteen categories in 1995 and eighteen categories in 1996. *Id.* In the 1997 ranking, Benham received "above acceptable standards" in two of thirteen categories. *Id.* All of the evaluations were conducted by Christopher and signed by Benham. Furthermore, Benham received a $2,500 raise in April 1997. *Id.* Although this raise was slightly above the amount given to all employees (Plaintiff's Statement of Material Facts, Docket No. 60 at 3), it was the lowest raise awarded among Christopher, Benham, and Rys, the three senior officers. Defendant's Statement of Undisputed Facts, Docket No. 54 at 2.

#### 2. Failure To Cooperate and Comply With An Outside Audit

In July of 1997, the Bank hired Wolf & Company, P.C. to conduct an independent audit of the Bank ("July audit"). The July audit lasted two days, with an exit meeting on the third, and was substantially performed by auditor Stephen King ("King"). At the time of the audit, Benham was head

of the Consumer Lending Department. It was King's practice to meet with the various department heads when conducting an audit. Defendant's Exhibit 2, Deposition of Stephen King, Docket No. 55 at 109 ("King Deposition"). Over the course of the two days, King mentioned, in passing, that he would like to speak to Benham. *Id.* He stopped by her office a number of times, but she was on the phone or otherwise busy. *Id.* Benham understood King's requests to meet as informal, and not necessary to the completion of the audit. The two never had an opportunity to discuss King's recommendations before the exit interview. King Deposition, Docket No. 55 at 56–57, 109.

The July audit of the Lending Department contains approximately thirty "exceptions" noted by auditor King. Plaintiff's Exhibits Volume II, Docket No. 64, Exhibit 29. The scope and substance of the audit is unclear, however. It appears that some of the "exceptions" noted are purely ministerial. For instance, certain changes were suggested merely to "simplify and clarify lending procedures." *Id.* Other recommendations seem more significant, indicating changes necessary to meet federal or state guidelines. *Id.*

Although not happy with the audit, Benham reviewed the findings with the Consumer Lending Department and took steps to institute the changes suggested by King. Plaintiff's Exhibit Volume II, Docket No. 54, Exhibit 28. Some of the changes required making alterations to the Bank's computer software program and, therefore, could not be completed immediately. *Id.* Benham spoke to King on the phone twice and agreed to wait until the

second audit, scheduled for October, to discuss these compliance issues. Plaintiff's Statement of Material Facts, Docket No. 60 at 25.

Benham was discharged on October 15, 1997, before the second audit had occurred. Some time later in that month, King returned to conduct a second audit ("October audit"). King Deposition, Docket No. 55 at 11–12. Upon review of the consumer lending department, King found that five of the recommendations he had made in July had not been instigated. King Deposition, Docket No. 55 at 61. In addition, King found three additional exceptions for which he recommended changes. *Id.*

### 3. *Violations of the Bank's Code of Conduct*

As early as 1996, the Bank instituted a Code of Conduct. Defendant's Exhibits, Docket No. 54, Exhibit 1. The Code of Conduct, in part, governed the granting of loans to Bank employees or family members of Bank employees. The Code of Conduct required employees to avoid any conflicts of interest, or appearance of a conflict of interest that would benefit an employee or an employee's family. *Id.* The Code of Conduct also stated that the Bank would not give preferential treatment or special credit terms to any employees of the Bank.[3] *Id.*

The Code of Conduct, however, did not prohibit loans to employees or their family members and, in fact, such loans were not uncommon. Christopher, Janet Maschino, Vice President of Technology Operations, and Marge Pero, Assistant Vice President,

---

**3.** The Code of Conduct provides, in pertinent part:

> Each Lenox Saving Bank employee must avoid any conflict of interest which might result in personal benefit to the employee or members of the employee's family. Similarly, any appearance of such conflict of interest should be avoided ... Lenox Savings Bank will not grant special credit terms or other preferred treatment to its employees or trustees or to any companies

> they control. Any loans or other extension of credit will be made in full compliance with applicable federal and state rules and regulations and on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with persons not associated directly or indirectly with Lenox Savings Bank.

Defendant's Exhibits, Docket No. 54, Exhibit 1.

Consumer Loan Officer, had all either taken out loans themselves or had family members who had taken out loans at the Bank. Plaintiff's Exhibits Volume II, Docket No. 64, Exhibit 19(B) at 81 ("McNinch Deposition"); Plaintiff's Exhibits Volume II, Docket No. 64, Exhibit 20(B) at 43 ("Maschino Deposition"); Plaintiff's Exhibits Volume II, Docket No. 64, Exhibit 23(B) at 67, 69, 74 ("Pero Deposition"). To insure against conflicts of interest, the Bank required an employee seeking a loan personally or a family member to present the application to another employee for approval. Maschino Deposition, Docket No. 64 at 43–44.

In October 1996, as part of an aggressive strategy to increase the number of mortgages, the Bank instituted a First Time Home Buyer's Program ("the program"). Plaintiff's Exhibits Volume II, Exhibit 21. The program provided favorable terms and benefits to qualifying loan borrowers. In order to qualify, a borrower had to have met the Bank's existing loan guidelines and, in addition, be a first-time home buyer with at least two years verifiable income.

In May 1997, Benham asked Jackie McNinch ("McNinch"), the Bank's loan originator, to process a mortgage application on behalf of Benham's daughter and son-in-law, Paula and Joseph Copz. McNinch Deposition, Docket No. 64 at 19; Defendant's Statement of Undisputed Facts, Docket No. 54 at 16. Benham instructed McNinch to have another loan supervisor review the file for approval. McNinch Deposition, Docket No. 64 at 29.

The Copz family was placed in the First Time Home Buyer's Program even though Joseph Copz had previously owned a home with his former wife. *Id.* at 26–27. The Bank claims that McNinch approached Benham with a number of questions about the application and claims that Benham instructed her to include Paula Copz's income from waitressing as verifiable income even though she had only been working for nine months. Defendant's Statement of

Undisputed Facts, Docket No. 54 at 16; McNinch Deposition at 23. In addition, the Bank asserts that Benham instructed McNinch to exclude Joseph Copz's alimony payments from his income, in violation of standard procedure, so that he would meet the Bank's lending guidelines. Defendant's Statement of Material Facts, Docket No. 54 at 16; McNinch Deposition, Docket No. 64 at 34–40.

Benham asserts that she had no idea that the Copz family was being considered for the First Time Home Buyer's Program, and thus did not know of the specific lending requirements. Benham Deposition, Plaintiff's Exhibits Volume I, Docket No. 64, Exhibit 9 at 116–117 ("Benham Deposition"). Further, she had no direct involvement in the processing or approval of the Copz loan. *Id.* at 112–114. Benham asserted that McNinch, a new employee, asked her many questions—most of which were posed as hypotheticals—and that she did not intentionally or directly tell McNinch how to fill out the forms. *Id.* Benham does not remember having a conversation with McNinch about how to characterize Joseph Copz's alimony payments. Benham Deposition, Docket No. 64 at 101–102; Defendant's Exhibits, Docket No. 55, Exhibit 1.

McNinch brought the completed application to Janet Maschino ("Maschino"), Vice President of Technology Operations, for approval. McNinch Deposition at 29, Maschino Deposition, Docket No. 64 at 24. Maschino was aware that the loan was for Benham's daughter. McNinch Deposition at 57–58. McNinch remembered telling Maschino that she could not verify Paula Copz's income as required for the First-Time Home Buyer's Program. McNinch Deposition at 29. The notes in the file also stated that Paula Copz's income might not have met the program's guidelines, that Joseph Copz's income did not include alimony payments and that he had previously owned a home with his former wife. Maschino Deposition, Docket No. 64 at 56, 64. Maschino approved the loan without look-

ing at the file. Maschino Deposition at 28–29, 57–58.

In 1997, Benham transferred information from two of the Copz's prior loan applications to a home equity loan application. Benham Deposition, Docket No. 64 at 118–120. The Copz family sought a home equity loan of $81,000 to make improvements on their house. Benham gave the home equity loan application to Marge Pero ("Pero"). *Id.* Benham told Pero that the rest of the information necessary to complete the application was in the file and that Pero should do all of the standard procedures to determine whether it should be granted. *Id.*

The Bank calculated home equity loans based on a ratio that considered the amount of the loan compared to the value of the house ("loan-to-value ratio"). Pero Deposition, Docket No. 64 at 8. Benham informed Pero that the loan-to-value ratio for the Copz mortgage might not meet Bank guidelines yet, but that the family was using the loan money to make improvements on their home. Benham Deposition, Docket No. 64 at 120; Pero Deposition, Docket No. 64 at 38. With the improvements on the house calculated into the loan-to-value ratio the loan should have met the Bank's guidelines. Pero Deposition, Docket No. 64 at 38. Benham suggested that the loan be disbursed in installments as the home improvements were completed and approved by the Bank. Benham Deposition, Docket No. 64 at 123. According to Benham, it was not an exceptional practice to calculate loan-to-value ratios based on the property as improved and then to issue the money in installments as the improvements progressed. Benham Affidavit, Docket No. 63 at 40; Benham Deposition, Docket No. 64 at 118–120. Pero filled out the loan and approved it, although she felt that she might have been granting preferential treatment to the Copz family. Pero Deposition, Docket No. 64 at 40.

On October 14, 1997, the day before Benham was fired, Joseph Copz applied for a third loan from the Bank, an installment loan, which he intended to use to pay creditors. Benham Deposition, Docket No. 64 at 130, 131. Benham filled out the paperwork on this form as well. *Id.* The application only contained Copz's name and address and was not signed by him and was therefore considered incomplete. Benham Deposition at 134. Benham placed her initials in the upper left hand corner of the application. Benham Deposition, Docket No. 64 at 134; Christopher Affidavit, Docket No. 55 at ¶ 36. Christopher discovered the application with Benham's initials at the top. Christopher Affidavit, Docket No. 55 at 7–8. Christopher considered the initials on the application as an indication that the loan had been approved. Christopher Affidavit, Docket No. 55 at 7–8. Shortly thereafter, Joseph Copz withdrew the loan application. Benham Deposition, Docket No. 64 at 143.

On October 15, 1997, the day Christopher discovered the third loan application, Christopher met with Benham and confronted her about the three loans to the Copz family. Christopher Affidavit, Docket No. 55 at 37. Christopher stated that the loans did not meet the Bank's underwriting criteria and that he would not allow the third installment loan to Copz to close. *Id.* During this meeting, Christopher fired Benham. Amended Complaint, Docket No. 50 at ¶ 43.

On October 20, 1997, Christopher submitted a letter to the Bank's Board of Trustees articulating his reasons for firing Benham. Plaintiff's Exhibits Volume II, Docket No. 64, Exhibit 18. Christopher stated that Benham had been involved in three questionable loans to family members, that she had failed to make changes that Christopher had recommended, that she did not communicate fully with independent auditors, and that she had failed to implement many of the recommendations of the Bank's credit consultant.[4] *Id.*

---

4. In its motion papers, defendant does not    assert the final reason, that defendant failed

## IV. DISCUSSION

### A. Plaintiff's Burden On Summary Judgment Under ERISA

■ Section 510 of ERISA provides in part:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan.

29 U.S.C. § 1140. The ultimate inquiry in a § 510 case is whether the employment action was taken with the specific intent of interfering with the employee's ERISA benefits. *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 37 (1st Cir.1995); *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1222 (11th Cir.1993); *Biggins v. Hazen Paper Co.*, 953 F.2d 1405, 1417 (1st Cir.1992); *McGann v. H & H Music Co.*, 946 F.2d 401, 404 (5th Cir.1991). The "specific intent" requirement derives from the language of the ERISA statute ("for the purpose of interfering") and is "necessary 'to separate the firings which have an incidental, albeit important, effect on an employee's ... rights from the actionable firings, in which the effect of the firing on the employer's ... obligation was a motivating factor.'" *Barbour*, 63 F.3d at 37 (*quoting Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1111 (2d Cir.1988)). Thus, no ERISA cause of action will lie where the loss of benefits was a mere consequence of, but not a motivating factor behind, a termination of employment. *Id.*

In most employment discrimination cases, as here, the employee relies on circumstantial evidence to prove her case.[5] On summary judgment, the court must weigh and assess the circumstantial evidence within the three stage, burden-shifting framework first outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and further explained and refined in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254–55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), and most recently addressed in *Reeves v. Sanderson Plumbing Prods., Inc.*, —— U.S. ——, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The *McDonnell Douglas* burden-shifting framework has been applied to employment discrimination claims under a variety of federal statutes, including ERISA.[6] *See, Barbour*, 63 F.3d at 38 (1st Cir.1995). The framework is useful because it "allocates burdens of production and orders the presentation of evidence

---

to implement changes suggested by the Bank's credit consultant, as a rationale for its decision to terminate Benham. As a result, this court will not address the sufficiency of this rationale.

**5.** Plaintiff and defendant agree that there is no direct evidence of discrimination and that the case falls within the *McDonnell Douglas* burden-shifting framework, discussed *infra*.

**6.** The First Circuit "regard[s] Title VII, ADEA, ERISA, [ADA] and FLSA as standing *in pari passu* and endorse[s] the practice of treating judicial precedents interpreting one such statute as instructive in decisions involving another." *Serapion v. Martinez*, 119 F.3d 982, 985 (1st Cir.1997), *cert. denied*, 522 U.S. 1047, 118 S.Ct. 690, 139 L.Ed.2d 636 (1998); *accord, Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 428 n. 2 (1st Cir.2000) (in

analyzing discrimination claim under ADEA, court will sometimes refer to precedents drawn in other cases); *Dichner v. Liberty Travel*, 141 F.3d 24, 30 n. 5 (1st Cir.1998) ("draw[ing] freely on precedents from other types of discrimination cases" in applying *McDonnell Douglas* standard to ADA).

Given the new evidentiary standard articulated in *Reeves*, this practice may change, and the First Circuit may see fit to distinguish among the evidentiary burdens for the different statutes. No such distinction has yet been made, however, and it seems unlikely. As has been the practice in the First Circuit, this court will therefore refer to cases addressing a plaintiff's evidentiary burden in other employment discrimination statutes besides ERISA.

... so as to progressively 'sharpen the inquiry into the elusive factual questions of intentional discrimination.'" *Wooster v. Abdow Corp.*, 1996 WL 131143, *8 (D.Mass.1996) (*quoting Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255, n. 8, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

■ The three stages can be summarized as follows. First, plaintiff must establish by a preponderance of the evidence a *prima facie* case that she (1) is entitled to ERISA's protection, (2) was qualified for the position, and (3) was discharged under circumstances that give rise to an inference of discrimination. *Barbour*, 63 F.3d at 38.

At the second stage, the burden shifts to employer-defendant to produce a valid, nondiscriminatory reason for her dismissal. *See Thomas v. Eastman Kodak Co.*, 183 F.3d at 56. At this stage defendant has only a burden of production, and if sustained the presumption of unlawful discrimination disappears. *See Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1091 (1st Cir.1995).

At the third and final stage of the *McDonnell Douglas* framework, the burden shifts back to plaintiff. Now she has the burden of persuasion to establish by a preponderance of the evidence "'that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Reeves v. Sanderson Plumbing Prods., Inc.,* —— U.S. at ——, 120 S.Ct. at 2106, *citing, Burdine*, 450 U.S. at 253, 101 S.Ct. 1089.

There has been some conflict among the Courts of Appeals regarding the kind and amount of evidence a plaintiff must proffer to satisfy the third stage of the *McDonnell Douglas* analysis. In previous employment discrimination decisions, the First Circuit has held that "the ultimate burden is on the plaintiff to persuade the trier of fact that she has been treated differently because of her [retirement benefit status]" and has broken the burden into two separate tasks. *Thomas v. Eastman Kodak Co.*, 183 F.3d at 56. "The plaintiff must present sufficient evidence to show both that 'the employer's articulated reason for [terminating] plaintiff is (1) a pretext' and (2) that 'the true reason is discriminatory.'" *Griel v. Franklin Medical Center*, 71 F.Supp.2d 1, 7 (D.Mass.1999) (*quoting Thomas v. Eastman Kodak Co.*, 183 F.3d at 56). For expository convenience, this court has referred to the First Circuit rule as a "pretext-plus" standard. *Id.* (citations omitted).

In contrast to the First Circuit's "pretext plus" standard, other Circuits had held that a plaintiff need not proffer additional evidence of discrimination to survive the third stage of the *McDonnell Douglas* analysis. *See e.g. Combs v. Plantation Patterns*, 106 F.3d 1519 (11th Cir.1997), *cert. denied*, 522 U.S. 1045, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998); *Kline v. TVA*, 128 F.3d 337 (6th Cir.1997); *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061 (3rd Cir.1996), *cert. denied*, 521 U.S. 1129, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997). Instead, a plaintiff's *prima facie* case combined with evidence indicating that an employee's rationale for its decision was pretext satisfied the third stage. This evidentiary burden has been referred to as a "pretext only" standard.

After both parties had submitted their motions and memoranda of law in this case, the Supreme Court resolved this conflict between the Courts of Appeals.[7] *See Reeves v. Sanderson Plumbing Prods., Inc.,* —— U.S. at ——, 120 S.Ct. at 2104. *Reeves* addressed "the kind and amount of evidence necessary to sustain" a plaintiff's burden in the third stage of the *McDonnell Douglas* analysis.[8] *Id.* at 2103. In an

---

7. The parties issued supplemental memoranda after the *Reeves* decision articulating their arguments in light of its holding.

8. In *Reeves*, the Supreme Court reviewed the third stage of the *McDonnell Douglas* standard in the context of a judgment as a matter of law pursuant to Fed.R.Civ.P. 50. *Reeves* at

apparent repudiation of the "pretext plus" standard, *Reeves* held that "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation ..." *Id.* at 2108. A plaintiff need not produce additional evidence indicating that defendant's true reason was discriminatory.[9] Thus, in attempting to satisfy her evidentiary burden in the third stage of the *McDonnell Douglas* analysis, the "plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, at 2109.

As a result, in assessing whether plaintiff has satisfied her evidentiary burden under the *McDonnell Douglas* analysis, this court will weigh whether the plaintiff's *prima facie* case combined with evidence that her firing was pretextual is sufficient for a trier of fact to "infer the

ultimate fact of discrimination."[10] *Reeves*, at 2109; *accord Conto v. Concord Hosp. Inc.*, 2000 WL 1513798, *6 (D.N.H.2000); *Boy v. General Electric Co.*, 115 F.Supp.2d 109, ——, 2000 WL 1434776, *2 (D.Mass. 2000).

### B. *McDonnell Douglas Analysis*

For the purposes of this motion, defendant has conceded that plaintiff has met her *prima facie* burden. Report and Recommendation, Docket No. 81 at 10; Mem. of Law in Support of Def.'s Motion for Summary Judgment, Docket No. 57 at 6. Yet, since the *prima facie* burden may have taken on some added significance in light of *Reeves*, this court will summarize the facts indicating that Benham has cleared that hurdle.

First, Benham is a member of a protected class under ERISA because she has attained rights through employer benefit programs, including the SBERA Plan and

---

2102. The *Reeves* analysis is appropriate here, however, since "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

9. Evidence indicating pretext alone may not be sufficient in some circumstances. For instance, "if the circumstances show that the defendant gave the false explanation to conceal something other than discrimination, the inference of discrimination will be weak or nonexistent" *Reeves* at 2109 (quoting *Fisher v. Vassar College* 114 F.3d 1332, 1338 (2d Cir. 1997) (en banc)). Similarly, "if plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted evidence that no discrimination had occurred," no rational factfinder could conclude that employee's decision was discriminatory. *Id.*

Neither of these circumstances applies here. First, the Bank does not contend that it gave a false explanation to conceal another non-discriminatory reason. Second, as noted *infra*, Benham's evidence, taken in the light most favorable to her, is sufficiently probative of pretext and defendant's "uncontroverted" evidence is not sufficiently abundant to justify summary judgment.

10. It appears that the Court of Appeals may continue using the phrase "pretext plus" to describe an employer's evidentiary burden in the *McDonnell Douglas* analysis. In *Feliciano De La Cruz v. El Conquistador Resort and Country Club*, 218 F.3d 1 (1st Cir.2000) the First Circuit stated that the term "pretext plus" "did not mean that the plaintiff always must present evidence beyond the proof of pretext in order to establish discrimination" and that therefore its prior cases were not inconsistent with *Reeves*.

In this memorandum, however, it will be easiest to avoid the phrase. Even before *Reeves*, the First Circuit had been shifting away from the requirement that employers provide additional evidence linking the employer's decision to discriminatory intent. *See e.g. Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 57 (1st Cir.1999) ("Although it uses the label 'plus,' the First Circuit's 'pretext plus' standard does not necessarily require the introduction of additional evidence beyond that required to show pretext"); *Woods v. Friction Materials, Inc.*, 30 F.3d 255, 260 n. 3 (1st Cir.1994) ("Some cases exist where a prima facie case and the disbelief of a pretext could provide a strong enough inference of actual discrimination to permit the fact-finder to find for the plaintiff"). Given this drift, and the *Reeves* decision, the phrase has become unhelpful.

the Brick Plan. *Barbour,* 63 F.3d 32, at 38. Second, Benham was clearly qualified for the position she held. She had been working at the Bank full time for over twenty years. Since 1986 she had held positions of authority at the Bank. Amended Complaint, Docket No. 50 at 3. What is more, she had held her last position, as Senior Vice President, for six years prior to her termination. *Id.*

Finally, Benham has produced evidence that her discharge occurred under circumstances that give rise to an inference of discrimination. Benham had acquired significant retirement benefits and was terminated at a time when the Bank appeared to be directly concerned with the costs of its retirement programs and had taken efforts to reduce the financial burden those programs created. In addition, Christopher, who had made both the decision to reduce or eliminate the benefits plans and the decision to terminate Benham, was aware that Benham was the Bank's most costly employee in terms of pension benefits. Report and Recommendation, Docket 81 at 18.

■ The *prima facie* case being established, the burden shifts to defendant to articulate a non-discriminatory reason for terminating Benham. "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves,* at 2106 (*quoting St. Mary's Honor Center v. Hicks,* 509 U.S. at 509, 113 S.Ct. 2742). In this case, defendant has met its burden: defendant has proffered admissible evidence sufficient to demonstrate that Benham was fired because her job performance had declined in recent years, because she had failed to cooperate with or comply with an outside auditor's recommendations and because she violated the Bank's Code of Conduct.

■ Since defendant has provided a legitimate non-discriminatory reason for its action, the initial presumption drops from the case and the burden shifts back to plaintiff to prove discrimination. *See*

*Reeves* at 2106 (*citing Hicks,* 509 U.S. at 510, 113 S.Ct. 2742); *see also Thomas* 183 F.3d at 61–62. At this stage, plaintiff must produce enough evidence to justify a jury in finding the ultimate fact of discrimination. In determining whether plaintiff's allegations meet the burden of proving discrimination for purposes of summary judgment, this court must consider a number of factors, including "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation was false and any other evidence that supports the employer's case and that properly may be considered on a motion for [summary judgment]." *Reeves,* at 2109. This court finds that plaintiff has provided enough evidence to show that the Bank's decision was pretext. Since evidence indicating pretext, at least in this case, is more than sufficient to carry plaintiff's case past summary judgment, the following discussion will analyze this factor specifically.

■ A plaintiff can show her employer's decision was pretext in a number of ways. For example, she can attack the employer's proffered reason for its decision directly by identifying " 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons' such that a factfinder could 'infer that the employer did not act for the asserted non-discriminatory reasons.'" *Santiago–Ramos,* 217 F.3d at 56 (*quoting Hodgens,* 144 F.3d at 168 (1st Cir.1998)). Second, a plaintiff can show pretext by demonstrating that her employer treated her differently than other, similarly situated, employees. *See e.g. Thomas v. Eastman Kodak Co.,* 183 F.3d at 64. Taken in the light most favorable to her, Benham's evidence reveals inconsistencies in the Bank's proffered reasons for firing her. In addition, she has provided sufficient evidence to prove that she was treated differently from other employees in similar situations.

### 1. Inconsistencies In The Bank's Proffered Explanation

Defendant asserts that Plaintiff's job performance had declined in recent years. Defendant points to Benham's performance evaluations, noting that those evaluations dropped from a majority of "above acceptable standards" ratings to a majority of "acceptable standards" ratings. Benham vigorously denies this characterization and claims that she has met or exceeded acceptable standards throughout her time at the Bank.

■ On the question whether an explanation of poor job performance is pretext, a plaintiff's mere personal disagreement with her employer's opinions about her job performance is not sufficiently probative to avoid summary judgment. *See Shorette v. Rite Aid of Maine, Inc.*, 155 F.3d 8, 15 (1st Cir.1998); *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir.1997); *Ost v. West Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 441 (7th Cir.1996). Here, however, it is not plaintiff's own words that cast doubt on the Bank's proffered explanation, it is the very evaluations that the Bank cites as indicative of a decline that cast doubt on the credibility of the claim. Although it is true that Benham's evaluations from 1993 to 1997 went from stellar to acceptable,[11] whether such a change indicates a "substantial decline" warranting termination is disputable. Indeed, the job evaluations indicate that, at all times recorded, defendant believed Benham's work had met acceptable standards and, at least in two areas, surpassed those standards. None of plaintiff's job evaluations indicate that her performance was sub-par or, in any other way, indicate that Benham's job performance merited termination. It is entirely possible that a jury, faced with this somewhat thin evidence of declining job performance, would determine that such an accusation was a pretext. *See Feliciano De La Cruz v. El Conquistador Resort and Country Club*, 218 F.3d 1, 7 (1st Cir.2000) ("It is ... reasonable to infer that [employer] would not have sent [employee] even generic commendation if it were truly dissatisfied with her job performance and that the company would have formally communicated its dissatisfaction in some way before terminating her employment").

### 2. Failure To Cooperate With An Independent Audit

The Bank also cites Benham's failure to cooperate or comply with an independent audit as a rationale for its decision. The audit, conducted in July 1997, noted roughly thirty "exceptions" in Benham's department. The gravity of these exceptions is unclear. Some of them appear to be important; others appear to be purely ministerial and noted for the purpose of simplifying and clarifying lending procedures. Unfortunately, neither party's papers indicate which of the "exceptions" are serious deficiencies and which are merely suggestions for more efficient operation. Taken in the light most favorable to Benham, "what sounds like a massive indictment could ... [be] read by a jury as a list of technical ... recommendations" that would not call for dismissal. *Carey v. Mt. Desert Island Hosp.*, 156 F.3d 31, 36 (1st Cir.1998) (addressing the sufficiency of the evidence in the analogous context of a post-judgment challenge to a jury verdict).

Even if the exceptions were serious, it appears that Benham addressed each of the exceptions with her department. Of the roughly 30 "exceptions," plaintiff corrected twenty-two. Plaintiff's Exhibits,

---

11. Benham's evaluations for the four years prior to her discharge are as follows:

June 21, 1993—rated "above acceptable standards" or "outstanding" in 23 out of 25 categories

June 17, 1994—rated "above acceptable standards" in 18 out of 25 categories

March 22, 1995—rated "above acceptable standards" in 15 out of 25 categories

April 4, 1996—rated "above acceptable standards" in 18 out of 25 categories

March 24, 1997—rated "above acceptable standards" in 2 out of 13 categories

Docket No. 64, Exhibit 28; Plaintiff's Exhibits, Docket No. 64, Exhibit 29. Four suggestions were either determined not to apply to the Bank, or were determined to be less efficient given the Bank's current operations. *Id.* Further, efforts were being made to incorporate four of the suggestions into the Bank's software system, and that the issue was addressed initially on July 21, 1997 and again on September 26, 1997. Plaintiff's Statement of Material Facts, Docket No. 60 at 25; Plaintiff's Exhibits Volume II, Exhibit 28.

Of course, the fact that some of the exceptions had not been addressed could indicate a "critical shortcoming." *Carey,* 156 F.3d at 36. On the other hand, the fact that a majority of exceptions had been addressed and that others were in the process of being addressed "might well . . . appear[ ] to the jury as less than a clarion call for termination." *Id.* (where initial outside audit indicated thirteen areas of criticism and second audit contained five areas of criticism, a jury could find a lack of compliance with the audit report as pretext). Indeed, auditor King himself suggested that the audit indicated weaknesses, but also stated that the Consumer Lending Department had been responsive to the audit. Deposition of Steven King, Docket No. 64 at 55.

In addition, Benham points to several reports from federal and state regulatory agencies that indicate that her compliance history had been good. In her seven years with the Loan Department, the Department had received the highest grade of "satisfactory" from the Commissioner for the Division of Bank's for the Commonwealth of Massachusetts and the FDIC. Plaintiff's Statement of Material Facts, Docket No. 60 at 24. The Bank's rating under the Community Reinvestment Act improved from a "low satisfactory" to a "high satisfactory" under her tenure. *Id.* A jury may find that such reports from

outside agencies cast some doubt on the weight of the "exceptions" indicated in the audit report, as well as the Bank's claim of a pattern of decline in her job performance.

Finally, the Bank undermines the credibility of its own claim that Benham's failure to comply with the July audit motivated its decision. In articulating her lack of compliance, the Bank asserts that "many of the cited lending violations had not been remedied by the time of the October audit—in fact there were five still outstanding violations and three *new* violations." Defendant's Motion for Summary Judgment, Docket No. 57 at 10.

Although the exact date of the October audit is not clear from the parties submissions, Benham asserts that the audit occurred after she had been terminated (Plaintiff's Statement f Material Facts, Docket No. 60 at 26) and the Bank does not dispute this. As a result, the findings of that audit could *never* have influenced Christopher's decision to fire Benham since those findings had not yet been made. Any attempt to justify its decision by relying on the findings of the October audit fails as blatant pretext. *See Santiago–Ramos,* 217 F.3d at 56 (plaintiff can show pretext by demonstrating that employer's "non-discriminatory reasons were after-the-fact justifications, provided subsequent to the beginning of legal action").

### 3. *Disparate Treatment*

The Bank claims that Benham violated its Code of Conduct by improperly involving herself in the approval of three loans to her family members, in violation of its code of conduct. Plaintiff argues that this rationale for firing her was pretextual because the Bank failed to take any action against other employees who were involved in the questionable loan transactions.[12] In short, plaintiff asserts that the

---

12. Plaintiff also vigorously asserts that there was nothing questionable or improper about

the loans themselves.

Bank's rationale indicates evidence of disparate treatment.

The key to showing pretext in a disparate treatment case is comparative evidence. *See McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817 ("Especially relevant to [a showing of pretext] would be evidence that [nonprotected] employees involved in acts against [the employer] of comparable seriousness . . . were nevertheless retained or rehired."); *Thomas v. Eastman Kodak Co.,* 183 F.3d 38, 62 (1st Cir.1999) ("The [pretext] portion of [plaintiff's] third-stage burden is to produce sufficient evidence to show that she was not evaluated on the same terms as her colleagues, but rather was evaluated more harshly than other [nonprotected colleagues]"). Here, the plaintiff has the burden of showing that she was treated differently from similarly situated non-protected persons. *See Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 17 (1st Cir. 1994). She must "identify and relate specific instances where persons similarly situated 'in all relevant respects' were treated differently." *Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 19 (1st Cir.1989). In addition, she must identify these instances "in terms of performance, qualifications, and conduct, 'without such differentiating or mitigating circumstances that would distinguish' their situations." *Stratus Computer,* 40 F.3d at 17 (*quoting Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir.1992)); *see Rodriguez–Cuervos v. Wal–Mart Stores, Inc.,* 181 F.3d 15, 21 (1st Cir.1999) (summarizing this test for showing pretext).

In evaluating disparate treatment claims "reasonableness is the touchstone; while the plaintiff's case and the comparison cases that [she] advances need not be perfect replicas, they must closely resemble one another in respect to relevant facts and circumstances." *Conward v. Cambridge Sch. Comm.,* 171 F.3d 12, 20 (1st Cir.1999). The circumstances need not be identical; however, "the cases must be fair congeners." *Dartmouth Review,* 889 F.2d at 19. "The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." *Id.*

Benham proffers the following evidence of disparate treatment. She claims that the three employees who were involved in the loans to the Copz family also violated the Code of Conduct, yet suffered no adverse consequences. Jackie McNinch was promoted to Vice President of Consumer Lending after admitting that she had included unverifiable income on the Copz's First–Time Home Buyer's loan application. Jannine Maschino did not review the Copz file and ignored McNinch's concerns about the loan before approving the First–Time Home Buyer's Mortgage. Maschino received a bonus and a raise. Finally, Marge Pero approved the home equity loan to the Copz family without reviewing the file and in spite of her concerns about the loan-to-value ratio. Pero, too, received a bonus and a raise. None of these three were reprimanded, fired, placed on probation, or terminated. What is more, nothing about the incidents was noted in their personnel files.

The Bank argues that McNinch, Pero and Maschino were not similarly situated. It states: (1) that as Senior Vice President, Benham held a senior position and was, therefore, more culpable; (2) that McNinch, Pero and Maschino were all subordinates of Benham and were vulnerable to coercion; and (3) that the other employees were not involved in loan transactions to their own family members.[13]

---

13. In addition, the Bank suggests that Benham alone was involved in the third loan application of Joseph Copz. It argues that this loan, by itself, is evidence of a Code of Conduct violation meriting termination. There are, however, genuine issues of fact regarding the third loan application and whether it had been approved by Benham. Benham argues that the loan was not approved and was, in fact, incomplete since Joseph Copz had never signed the completed application.

■ The Bank is correct in arguing that Jackie McNinch is not similarly situated and therefore not an appropriate subject for disparate treatment analysis. McNinch had about 16 years experience in banking, but had only started working at Lenox Bank in October of 1996, less than a year before the approval of the Copz's First–Time Home Buyer's Loan. At that time, she did not have authority to approve loans. Instead, she would collect the relevant information and present the completed application to a senior lender—either Benham, Maschino, or Christopher—for approval. Due to her relatively recent employment and her inability to approve loans on her own, her position differs significantly enough from Benham's that any disparate treatment would not be sufficiently probative of pretext.

■ On the other hand, Maschino and Pero are similar enough in all relevant respects to offer appropriate comparison. At the time of the loan approval, Maschino had worked at the Bank for eighteen years and was Vice President of Technology Operations. She had authority to review and approve loans. Although Maschino reported to Benham, she was in a similar position of seniority and authority and had similar power to accept or reject loan applications.[14]

Maschino had some indication that the Copz loan might not meet the Bank's First–Time Home Buyer's criteria both from her discussion with McNinch and from the information contained in the file. Nevertheless, she approved the loan without ever looking at the file. Maschino Deposition, Docket No 64 at 28–29, 58–57. Maschino admitted that this was not standard practice, but that she had made an exception under the circumstances. Maschino Deposition at 57. Despite the irregularities, Maschino was never disciplined or written up for her participation in approving the loan. Plaintiff's Affidavit at 64.

Marge Pero had been working at Lenox Bank for nearly twenty years and held the position of Assistant Vice President, Consumer Loan Officer. Pero Deposition at 4. She, too, was a subordinate to Benham,

Resolution of this issue requires a more thorough understanding of the Bank's lending procedures. Unfortunately, the record provides scant support for the Bank's claim that initials in the corner of the application indicate that it had been approved. The Bank provides no documentation or affidavits asserting that an unsigned loan initialed by a Bank employee would be considered approved and ready to process. *See Ward v. Massachusetts Health Research Institute, Inc.,* 209 F.3d 29, 35 (1st Cir.2000) (employer, who has access to relevant evidence, should bear burden of proving its rationale for termination). Given that loans to family members were not uncommon, there is a genuine issue of fact as to whether Benham's merely filling out a portion of the · application, without more, constituted a violation of the Code of Conduct.

14. The Bank makes much of Benham's senior status with respect to Maschino and Pero. Yet, the three had been working at the bank together for eighteen years. Such a long work history would tend to belie the notion that a senior employee could intimidate or coerce her subordinates.

In addition, the Bank did not appear to disapprove of subordinates granting loans to their superiors. For example, Maschino had requested that Pero, her subordinate, review a loan on her behalf. Christopher, too, requested that subordinates review his loan applications. Despite the difference in title and seniority, Maschino indicated that there was nothing improper in this arrangement since Pero was "the appropriate person [to] see for that type of loan." Maschino Deposition, Docket No. 64 at 48.

On a similar note, there appear to be other documents discussing Benham's role in the processing of the three loans that were created in contemplation of litigation. In particular, there are three letters drafted by Christopher and signed by Maschino, Pero, and McNinch suggesting that they were pressured by Benham into approving the loans. These letters, however, were written in November 1997, after Benham had made her intentions to sue clear. *See* Affidavit of Daniel R. Solin, Docket No. 62, Exhibit A. Because these letters appear to be written in contemplation of this suit, they will not be included in the analysis as favoring or disfavoring either side. *See Santiago–Ramos,* 217 F.3d at 56

but had independent authority to approve or deny loan applications. Pero Deposition at 5. Pero claimed that she was made aware that there might be some problem with the Copz home equity loan when Benham handed her the file—namely that the loan-to-value ratio might not meet Bank guidelines. Pero Deposition at 62. Nevertheless, Pero did not review the loan application or have another senior officer such as Christopher or Maschino review it. Pero Deposition at 57–59. Instead, she granted the loan despite the irregularities. As with Maschino, Pero was not reprimanded or, in any other way, criticized for her role in approving the loan.

The Bank emphasizes the fact that it was Benham's family members that received the questionable loans. Yet, other Bank employees and their family members had received loans from the Bank. Although there appears to have been no set policy for exactly how such loans should be processed, generally a disinterested—that is to say, non-related—loan officer reviewed the loans and independently determined whether to approve them. With both of the Copz loans, an independent loan officer had an opportunity to review the applications and understood that employee family members should not gain special treatment. It is entirely possible that a jury will determine that, far from violating the Code of Conduct, Benham attempted to comply with its guidelines—that is, she had the loans approved by another loan officer. A jury may further conclude that it was Maschino and Pero who provided preferential treatment to the Copz family in failing to review the file before approving the loans.

Even if a jury finds that Benham did violate the Code of Conduct, it may also consider the violations of Maschino and Pero equally, if not more, serious. In that respect, the fact that they received no reprimand and felt no adverse consequences for their participation in the same transaction may lead a jury to conclude that the Code of Conduct rationale was a pretext. *See McDonnell Douglas* 411 U.S. at 804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (evidence that nonprotected employees were treated differently for acts of comparable seriousness is especially relevant to the showing of pretext). Since Benham provides sufficient evidence that the Bank's purported reason for firing her is inconsistent and that she was treated differently from similarly situated employees, she has met her burden of showing pretext and survives the Bank's summary judgment challenge.[15]

### V.  CONCLUSION

For the foregoing reasons, the Report and Recommendation of Magistrate Judge Neiman is adopted *in toto*. Defendant's Motion for Summary Judgment on the ERISA violation is hereby DENIED; in all other respects the motion is ALLOWED per the Report and Recommendation. The clerk will set a date for a status conference to set a schedule for future proceedings.

---

**15.** As noted, this showing alone is sufficient to survive summary judgment under *Reeves*. However, even if *Reeves* were given a more strict gloss, plaintiff has still met her burden in the third stage of the *McDonnell Douglas* analysis. This Court agrees with Magistrate Judge Neiman's findings that "Christopher, from the beginning of his tenure, was concerned about the cost of the Bank's employee benefits plan." Report and Recommendation at 13. By discharging Benham, its most costly employee, the Bank saved a significant amount of pension related money. Id. These facts, combined with evidence indicating pretext, satisfy plaintiff's burden of creating a genuine issue of material fact as to whether the loss of benefits was "a motivating factor behind" her termination. *See Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1111 (2d Cir.1988).